655 A.2d 1282

**Tracey HIGGINBOTHAM,**

v.

**STATE of Maryland.**

**No. 650, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

March 29, 1995.

146

Robert A. Scott, Student Atty. (Stephen E. Harris, Public Defender and Martha Weisheit, Asst. Public Defender, on the brief), Baltimore, for appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Stuart O. Simms, State's Atty. for Baltimore City on the brief), Baltimore, for appellee.

Before WILNER, C.J., and BISHOP and BLOOM, JJ.

BLOOM, Judge.

Appellant, Tracey Higginbotham, was convicted by a jury in the Circuit Court for Baltimore City of first degree felony murder and attempted robbery with a dangerous weapon. Appellant was sentenced to life imprisonment without parole on the felony murder conviction and to a concurrent prison term of twenty years on the conviction for attempted robbery with a dangerous weapon. In this appeal from those judgments, appellant presents the following issues for our determination:

I. Did the trial judge err in refusing to submit to the jury the charge of second degree murder?

II. Did the trial judge err in [sic] when he instructed the jury that with respect to felony murder, the intent to commit the felony need not coincide with the killing?

III. Did the trial judge err in denying appellant's motion to suppress his statement?

IV. Did the trial judge err in imposing separate sentences for felony murder and the underlying felony?

## FACTS

Appellant spent the afternoon and evening of 30 May 1991 smoking "crack" cocaine with his brother, Terry Higginbotham, and Tabitha Stanley, Terry's girlfriend, in the basement of appellant's mother's house at 3021 West Belvedere Avenue in Baltimore City. When the cocaine supply was exhausted around 2:30 a.m. on the morning of 31 May, appellant stated that he was going to obtain "one more blast" of cocaine. He further stated that, if he was unable to obtain more, he was going to go to the local trash collection company where he was employed. Appellant then put his work clothes into a blue bag, tucked a knife into the back of his pants, and exited the house.

Shortly thereafter, appellant hailed a taxicab on Belvedere Avenue. When the taxicab reached the intersection of Belvedere and Queensbury Avenues, appellant stabbed the taxicab driver in the neck. After the cab had crashed into the curb, appellant took a white bag belonging to the driver from the front seat and fled the scene.

Andrew Gould, who was sitting on the front steps of his house in the 3000 block of West Belvedere Avenue, testified that he saw a taxicab coasting toward the side of the road and heard someone yelling for help. After the taxicab crashed into the curb, Mr. Gould saw appellant climb out of the window of the car and run away. Another witness testified that the taxi driver then got out of the car and called for help.

Ms. Stanley testified that appellant, covered with blood and carrying a white bag, stumbled in the back door of the house, approximately twenty minutes after he left the house in search of cocaine. Appellant told his brother and Ms. Stanley that he thought he "might have killed somebody." He then proceeded into the basement, dropped the cab driver's bag onto the floor, removed his bloody clothing, and washed the blood from his hands.

When members of the Baltimore City Police arrived on the scene, the taxi driver, Lyle Roberts, was lying next to the taxicab with a fatal stab wound in the base of the right side of his neck. The interior and the exterior of the taxi were covered with blood, and there was a large knife on the hood of the car. Blood found on the knife matched the victim's blood. Inside the taxi, the police found a blue bag containing a pay stub with appellant's name on it. A palm print found in the taxi was later matched with appellant's palm print.

Later that same day, appellant's mother consented to a police search of the trash cans behind her house. During their search of the trash cans, police seized bloody clothing and a white bag that contained items that had belonged to the taxi driver. The blood on the clothing was later identified as the victim's blood.

The police arrested appellant on 6 June 1991 in Baltimore County and on 7 June transported him to Baltimore City where he was interviewed by Detectives Gary Childs and Christopher Graul. At 8:30 p.m., Detective Childs had appellant read Baltimore City Police Form 69 (waiver form), which set forth each of appellant's "*Miranda* rights." Appellant, who has a ninth grade education, had difficulty understanding some of the words in the form, including "attorney," "absolute," "explanation," and "appoint." After Detective Childs explained the meaning of the words and appellant stated that he understood them, appellant agreed to give a statement. He confessed to killing the victim. The detectives then explained appellant's *Miranda* rights to him a second time and appellant gave a tape recorded confession.

In February 1992, appellant was tried by a jury in the Circuit Court for Baltimore City on charges of premeditated first degree murder, second degree murder, first degree felony murder, robbery, and other related charges. He was convicted of first degree felony murder and robbery with a dangerous weapon and sentenced to life imprisonment without the possibility of parole. On appeal, this Court reversed the judgment entered on appellant's felony murder conviction, holding that the trial court failed to comply with Maryland Rule 4–215(e) when it prevented appellant from explaining why he was moving for a postponement of his trial. *Higginbotham v. State*, 95 Md.App. 732 (1993) (*Higginbotham I* ).

In February 1994, appellant was retried in the Circuit Court for Baltimore City on charges of first degree felony murder, robbery with a dangerous weapon, attempted robbery with a dangerous weapon, robbery, attempted robbery, assault, and theft. He was convicted of first degree felony murder and attempted robbery with a dangerous weapon. On 4 April 1994, appellant filed a timely notice of appeal to this Court.

## I.

Appellant's first contention is that the circuit court erred in refusing to submit the charge of second degree murder to the jury.

In appellant's first trial, the trial judge instructed the jury to consider initially whether appellant was guilty of first degree felony murder. The trial judge further instructed the jury to consider the charges of first degree premeditated murder and second degree murder only if it found appellant not guilty of first degree felony murder. Deliberating in accordance with those instructions, the jury found appellant guilty of first degree felony murder and made no findings with respect to the charges of first degree premeditated murder and second degree murder.

Following this Court's reversal of the judgment entered on appellant's felony murder conviction in the first trial, appellant

moved to have the charge of first degree premeditated murder dismissed in his second trial. According to appellant, the fact that the jury did not render a verdict on the first degree premeditated murder charge operated as an acquittal on that charge. Thus, appellant contended, retrial on that charge was barred by double jeopardy, the common law doctrine of autrefois convict, collateral estoppel, and res judicata. After hearing arguments on the motion, the circuit court concluded that the first degree premeditated murder charge was barred by principles of double jeopardy. At the State's request, the court also ruled that the State was precluded by principles of double jeopardy from charging appellant with second degree murder.

We need not address the propriety of the circuit court's granting of appellant's motion to dismiss the charge of first degree premeditated murder. It was upon appellant's motion that the circuit court ruled that that charge was barred by principles of double jeopardy. Because appellant requested the dismissal, he cannot now complain about the legal consequences flowing from that ruling.

■ Appellant asserts that an "instruction on second degree murder was supported by the evidence in this case, and was required by principles of fundamental fairness." In support of this argument, appellant relies on the decision of the Court of Appeals in *Hook v. State*, 315 Md. 25, 553 A.2d 233 (1989). In that case, the State charged Hook with first degree premeditated murder, first degree felony murder, second degree murder, manslaughter, and related offenses. At the close of its case-in-chief, the State, over the defendant's objection, entered a *nolle prosequi* on the second degree murder charge. The jury then convicted Hook of first degree murder under both theories—premeditation and murder committed in the perpetration of a felony.

On appeal, Hook asserted that the trial court erred in allowing the State to withdraw the second degree murder charge from the jury's consideration. The Court of Appeals held that the prosecutor's authority to *nol pros* a charge must

be constrained in situations where the entry of a *nolle prose-qui* essentially compels the finder of fact to either convict the defendant, who is clearly guilty of some offense, of the most serious charge, or acquit him. *Id.* at 41–42, 553 A.2d 233. Concluding that the entry of the *nolle prosequi* on the lesser included offense of second degree murder increased the risk of an unwarranted conviction of first degree murder and thus denied Hook a fair trial, the Court reversed the judgments and articulated the following principle:

> When the defendant is plainly guilty of some offense, and the evidence is legally sufficient for the trier of fact to convict him of either the greater offense or a lesser included offense, it is fundamentally unfair under Maryland common law for the State, over the defendant's objection, to *nol pros* the lesser included offense. . . . In short, it is simply offensive to fundamental fairness, in such circumstances, to deprive the trier of fact, over the defendant's objection, of the third option of convicting the defendant of a lesser included offense. And if the trial is before the jury, the defendant is entitled, if he so desires, to have the jury instructed as to the lesser included offense.

*Id.* at 43–44, 553 A.2d 233.

In the case *sub judice*, the charge of first degree felony murder perpetrated in the course of an armed robbery was submitted to the jury. As we stated in *Butler v. State*, 91 Md.App. 515, 523, 605 A.2d 186 (1992), *aff'd*, 335 Md. 238, 643 A.2d 389 (1994),

> [t]he murderous *mens rea* under [the theory of felony murder based on armed robbery] does not entail any intent to kill at all but only the intent to perpetrate the underlying felony. . . . Second-degree murder, by contrast, requires the specific intent either to kill or to commit grievous bodily harm against the victim. Although second-degree murder of the intent-to-kill variety is thereby a lesser, included offense subsumed within premeditated murder, it is not a lesser included offense within felony-murder.

Thus, appellant necessarily is asking this Court to extend the holding of *Hook* to apply to cases in which the uncharged offense is not a lesser included offense of a charged offense that is submitted to the jury.

An argument similar to the one raised by appellant was addressed by the Court of Appeals in *Dean v. State*, 325 Md. 230, 600 A.2d 409 (1992). In that case, the State indicted Dean for assault with intent to murder, attempted murder, assault with intent to disfigure, assault and battery, and assault. Prior to jury selection, the State, over Dean's objection, was permitted to enter a *nolle prosequi* on the charges of assault with intent to murder, assault with intent to disfigure, and assault, leaving only the charges of attempted murder and assault and battery to be considered by the jury.

Dean contended on appeal that the court erred in allowing the State to *nol pros* the charge of assault with intent to disfigure because evidence presented at trial would have supported the charge. Relying on *Hook v. State*, and its progeny, Dean further argued that his trial was rendered fundamentally unfair because the withdrawal of the charge essentially forced the jury to convict him of attempted murder. In reaching its decision, the Court initially noted that in neither of the two cases where the Court had addressed the scope and application of "the so-called *Hook* exception" did it "suggest that the exception should be expanded to include the *nol pros* of counts that are *not* lesser included offenses of those counts which go to the jury." *Id.* 325 Md. at 237, 600 A.2d 409 (discussing *Jackson v. State*, 322 Md. 117, 586 A.2d 6 (1991) and *Fairbanks v. State*, 318 Md. 22, 566 A.2d 764 (1989)). The Court then held that "the limitation placed on a prosecutor's authority to *nol pros* a charge set forth in *Hook* . . . is not applicable [to Dean]," *id.* 325 Md. at 239, 600 A.2d 409, since assault with intent to disfigure is "a lesser *related* offense rather than a lesser *included* offense" of attempted murder. *Id.* at 236, 600 A.2d 409.

We conclude that *Dean*, not *Hook*, is controlling in the present case. As we stated *supra*, second degree murder is

not a lesser included offense of first degree felony murder. The State, therefore, was not required, under the principles of fundamental fairness espoused in *Hook,* 315 Md. at 43–44, 553 A.2d 233, to charge appellant with second degree murder. *Dean,* 325 Md. at 239, 600 A.2d 409. Accordingly, we hold that the circuit court did not err in refusing to submit to the jury an issue as to whether appellant was guilty of second degree murder.

## II.

Appellant's second contention is that the circuit court erred when it gave the jury supplemental instructions to the effect that appellant could be convicted of felony murder even if the intent to commit the robbery was formed after he committed the act that caused the death of the victim.

After both parties had rested their cases, the court instructed the jury with respect to first degree felony murder as follows:

In order to convict the defendant of first degree felony murder, the State must prove, one, that the defendant committed an enumerated felony or attempted to commit an enumerated felony. In this case, it's robbery with a dangerous and deadly weapon, attempted robbery with a dangerous and deadly weapon, robbery, or attempted robbery, and that the defendant killed the victim, and that the act that resulted in the death of the victim occurred during the commission or the attempted commission of the enumerated felony, that is, of the robbery with a dangerous and deadly weapon, robbery or the attempt to commit either.

It is not necessary for the State to prove that the defendant intended to kill the victim.

. . . .

If the death causing act is part of the *res gestae,* the act is one that constitutes an immediate accompaniment of the felony, and is so closely connected with it that it becomes part of it, if and only if the transaction is an act emanating

from the felony so as to become part of it, part of the same episode.

The court also instructed the jury with respect to the elements of the crimes of robbery with a dangerous weapon, attempted robbery with a dangerous weapon, robbery, attempted robbery, assault, and theft.

During its deliberations, the jury sent the trial judge a note that asked the following questions:

Is it still called robbery if the intention to steal originates after an individual, the victim, has been killed? If you kill someone for whatever reason, and then decide to steal from him, is that called felony murder?

A discussion amongst the parties and the trial judge regarding the proper answer to the question followed the receipt of the note. The trial judge then convened the jury in the courtroom and responded to its questions as follows:

Let me instruct you that *if the intent to steal was not formed until after the force had resulted in the victim's death, then the taking and asportation of personal property after death would still be robbery as long as it is part and parcel of the same occurrence or episode.* In other words, if it's all part of the same *res gestae* of the event. *The answer, therefore, is yes.*

With regard to felony murder, if you find that, in fact, a robbery was committed and that beyond a reasonable doubt and to a moral certainty not only was it committed, but that the defendant committed the robbery, and if you find during the occurrence of or the episode of that robbery the [victim] died—was killed,—now according to the instruction I just gave you, either before or immediately after the asportation is not significant. What is significant that [sic] it all was part and parcel of the same occurrence, the same event, the same *res gestae,* Then, in fact, it is felony murder.

However, what is and is not part of the *res gestae,* what is and is not part of the same general occurrence is a factual issue for you as jurors to decide.

(Emphasis added). The parties then approached the bench and the following discussion ensued:

> MR. DENTON [DEFENSE COUNSEL]: I object to your answer. I would ask the Court to instruct the jury that it is up—up to them to determine whether the death—in other words, whether they were separate incidents and if—if they determine that the killing was one incident and the theft was a separate—
>
> THE COURT: That's not the law. It would be deceptive. In fact, I just told you *Stebbings* [sic]. I said to the contrary.

After being informed that the supplemental instructions had confused members of the jury, the trial judge gave an additional instruction:

> Let me—as I instructed you earlier, for a robbery there must be an intent to steal at the time of the taking. If the force precedes the taking, the intent to steal need not coincide with the force, but rather it's sufficient if there is force applied at some point to the victim by the defendant followed by at some point a taking of personal property from the person or from the presence of the victim with the intent to steal as part of the same general occurrence or episode or event or *res gestae.* And even if the force should result in death, a taking and asportation of property after death is nevertheless robbery if and in the event it's all part of the same occurrence.

Appellant's counsel once again took exception to the court's instructions, stating that "I think the answer should have been no or not necessarily, but you gave the answer and I just objected."

■ Under Maryland Rule 4–325, "[t]he trial judge must instruct the jury on every essential point of law supported by the evidence when requested to do so." *Sangster v. State,* 70 Md.App. 456, 473, 521 A.2d 811 (1987) (citations omitted). When appropriate, the court may supplement its instructions at a later time, and the extent of such supplementation is left to the discretion of the trial judge. *Howard v. State,* 66

Md.App. 273, 284, 503 A.2d 739, *cert. denied,* 306 Md. 288, 508 A.2d 488 (1986) (citing *Funkhouser v. State,* 51 Md.App. 16, 31, 440 A.2d 1114 (1982)).

■ The State argues that "[t]here is no evidence in this case from which the jury could reasonably infer that Higginbotham stabbed the taxi driver in the neck for some other reason and only after doing so decided as an afterthought to rob him." The State thus contends that appellant's proposed answer to the jury's questions was not supported by the evidence and could not have been submitted to the jury. *See Blackwell v. State,* 278 Md. 466, 477, 365 A.2d 545 (1976), *cert. denied,* 431 U.S. 918, 97 S.Ct. 2183, 53 L.Ed.2d 229 (1977). We need not address the merits of this argument. Even if we were to assume that the State's contention were correct, once the court chose to give supplemental instructions, it was required to state the law correctly. *See Mack v. State,* 300 Md. 583, 592, 479 A.2d 1344 (1984).

The jury asked two separate questions in its note to the trial judge. The parties and the court, however, treated the questions as one distinct question that asked, in effect, whether appellant could be found guilty of felony murder if the intent to commit the robbery was not formed until after appellant committed the act that caused the death of the victim. Viewing the jury instructions in their entirety, *Poole v. State,* 295 Md. 167, 186, 453 A.2d 1218 (1983) (stating that adequacy of a jury instruction must be viewed in the context of the overall charge) (citation omitted)), we conclude that the trial judge instructed the jury, in substance, that a felony murder conviction will lie where the defendant formed the intent to rob the victim subsequent to performing an act of force causing the victim's death, if the force constituted an element of the robbery. We now must determine whether these instructions correctly stated Maryland law with respect to felony murder and robbery. *See Mack,* 300 Md. at 592, 479 A.2d 1344.

■ Maryland Code (1957, 1992 Repl.Vol.), Art. 27, § 410 provides that "[a]ll murder which shall be committed in the

perpetration of, or attempt to perpetrate, any ... robbery" constitutes first degree felony murder. To secure a conviction for first degree felony murder, the State must prove that the defendant committed or attempted to commit a felony; that the defendant or another participant in the crime killed the victim; and that the act resulting in the death of the victim occurred in the perpetration, or attempted perpetration, of the felony. *See Bruce v. State*, 317 Md. 642, 645, 566 A.2d 103 (1989) (citations omitted). Except for the proof of death, the evidence required to secure a first degree felony murder conviction is the same evidence required to establish the underlying felony. *Newton v. State*, 280 Md. 260, 269, 373 A.2d 262 (1977).

To convict a defendant of the felony of robbery, the State must prove that the defendant took property from the victim's presence and control; that the defendant took the property by force or threat of force; and that, at the time the defendant took the property from the victim, he intended to deprive the victim of the property permanently. *See Stebbing v. State*, 299 Md. 331, 351, 473 A.2d 903, *cert. denied,* 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984) (citing *Midgett v. State*, 216 Md. 26, 43, 139 A.2d 209 (1958)). Addressing the requisite coincidence in time between the larceny and force elements of robbery, the Court of Appeals held in *Stebbing:*

> If the force precedes the taking of the property, the intent to steal need not coincide with the force. It is sufficient if there be force followed by a taking with intent to steal as part of the same general occurrence or episode. Even if the force results in death, a taking and asportation after death is nevertheless robbery.

*Id.* 299 Md. at 356, 473 A.2d 903 (citation omitted).

We hold that the trial judge's instructions in the case *sub judice* correctly stated Maryland law. Under *Stebbing,* if a person commits an act of force that causes the death of the victim and then forms the intent to deprive the victim permanently of his property, the taking of the property with that intent may constitute robbery if the act causing the death and

the "taking with intent to steal [are] part of the same general occurrence or episode." 299 Md. at 353, 473 A.2d 903 (citation omitted). Under these circumstances, the robbery could also serve as the underlying felony supporting a first degree felony murder conviction. Pursuant to Maryland Code (1957, 1992 Repl.Vol.), Art. 27, § 410, the act causing the death of the victim must have occurred "in the perpetration of, or attempt to perpetrate" the felony. If the act causing the death of the victim constituted the element of force in the robbery conviction, that act was part of the underlying felony. *Foster v. State*, 297 Md. 191, 215, 464 A.2d 986 (1983), *cert. denied*, 464 U.S. 1073, 104 S.Ct. 985, 79 L.Ed.2d 221 (1984), *appeal after remand*, 304 Md. 439, 499 A.2d 1236 (1985), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986). Thus, "logic dictates that the murder was committed in the perpetration of the felony" of robbery. *Id.*

Furthermore, Maryland Code (1957, 1992 Repl.Vol.), Art. 27, § 410 contains no explicit requirement that the intent to commit the underlying felony must exist prior to the commission of the act causing the death of the victim. We shall, therefore, decline appellant's invitation to read such a requirement into the statute. *See State v. Craig*, 82 Wash.2d 777, 514 P.2d 151, 155–56 (1973); *cf. People v. Ward*, 154 Ill.2d 272, 181 Ill.Dec. 884, 907, 609 N.E.2d 252, 275 (1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 204, 126 L.Ed.2d 161 (1993) (where neither robbery nor felony murder statutes require showing that intent was formed prior to act of force causing death of victim, State need only show that murder and robbery occurred as part of same criminal episode); *State v. Nelson*, 65 N.M. 403, 338 P.2d 301, 306, *cert. denied*, 361 U.S. 877, 80 S.Ct. 142, 4 L.Ed.2d 115 (1959) (holding that felony murder exists where killing is committed within *res gestae* of felony charged even if intent to commit the felony was formed after the homicide); *State v. Handy*, 331 N.C. 515, 419 S.E.2d 545, 552 (1992) (where neither robbery nor felony murder statutes require showing that intent was formed prior to act of force causing death of victim, State need only show that murder and robbery occurred as part of one continuous transaction); *Per-*

*ry v. State,* 853 P.2d 198, 200 (Okla.Crim.App.1993) (holding that felony murder exists where killing is committed within *res gestae* of felony charged even if intent to commit the felony was formed after the homicide). We need not address whether felony murder would apply in a situation in which the act causing the death of the victim did not constitute the force element of the robbery.

In support of his contention that "if a defendant forms the intent to commit the felony *after* the killing has already occurred, the killing cannot have occurred 'in the perpetration of' the felony" because "it would have occurred *prior to* the commission of the felony," appellant cites *People v. Green,* 27 Cal.3d 1, 164 Cal.Rptr. 1, 609 P.2d 468 (1980), *overruled on other grounds by, People v. Hall,* 41 Cal.3d 826, 226 Cal.Rptr. 112, 718 P.2d 99 (1986); *People v. Goddard,* 135 Mich.App. 128, 352 N.W.2d 367 (1984), *rev'd on other grounds,* 429 Mich. 505, 418 N.W.2d 881 (1988); *People v. Joyner,* 26 N.Y.2d 106, 308 N.Y.S.2d 840, 257 N.E.2d 26 (1970); and *Commonwealth v. Legg,* 491 Pa. 78, 417 A.2d 1152 (1980). Because these cases are distinguishable from the present case, we find them to be unpersuasive.

In *People v. Green,*[1] the Supreme Court of California held that Green did not commit a murder "during the commission" of robbery because it found that the intent to rob the victim was not formed until after Green had performed the act of force that caused the death of the victim. 609 P.2d at 501. This holding, however, was explicitly based on the fact that, under California law, "the act of force ... by which the taking is accomplished in robbery must be motivated by the intent to

---

1. *People v. Green* did not directly involve the application of California's felony murder statute. Instead, the court addressed whether a murder had been committed "during the commission" of robbery so as to support a finding that the robbery was a "special circumstance," thus elevating the murder to a capital offense. 609 P.2d at 498. In reaching its decision, however, the court followed the same analysis used by California's courts in cases interpreting whether a murder had been committed "during the commission" of a felony for purposes of applying the felony murder rule. *Id.* at 501 n. 44 (citations omitted). Thus, the court's decision remains relevant for purposes of our analysis.

steal. . . ." *Id.* In contrast with Maryland law, as explicated in *Stebbing*, 299 Md. at 353, 473 A.2d 903, in California, "if the larcenous purpose does not arise until after the force has been used against the victim, there is no 'joint operation of act and intent' necessary to constitute robbery." 609 P.2d at 501 (footnote omitted). In other words, the robbery is not considered to have begun until the defendant forms the intent to rob. As a result, once it found that the intent to rob was formed subsequent to the act of force, the California court could only conclude that under the law of that state the murder occurred prior to, and not during the commission of, the felony.

In *Commonwealth v. Legg*, the Supreme Court of Pennsylvania reversed Legg's felony murder and robbery convictions, holding that the trial court's felony murder instruction, which stated that " 'the intent to commit the felony of robbery may be formed by the . . . robber . . . either before or after the infliction of the fatal wound,' " was an incorrect statement of the law. 417 A.2d at 1154–55. Discussing the rationale behind Pennsylvania's felony murder rule, the court stated that the rule permits the finder of fact to infer that the killing was malicious "because the actor . . . knew or should have known that death might result from the felony." *Id.* 417 A.2d at 1154 (citation omitted). The court also remarked that the rule "seeks to add a greater deterrent to engaging in particularly dangerous felonies." *Id.* (footnote omitted). Based on these premises, the court then concluded that

> where an actor kills prior to formulating the intent to commit the underlying felony, we cannot say the actor knew or should have known death might occur from involvement in a dangerous felony *because no involvement in a dangerous felony exists since the intent to commit the felony is not yet formulated.* Also the greater deterrent is not necessary, and the rule has no application.

*Id.* (emphasis added) (citing *Commonwealth v. Spallone*, 267 Pa.Super. 486, 406 A.2d 1146 (1979)).

The court's statement that "no involvement in a dangerous felony exists [where] the intent to commit the felony is not yet formulated," *id.*, demonstrates that the rationale for the court's holding that a death is not a foreseeable consequence of the defendant's acts is implicitly based on the fact that, under Pennsylvania law, "an accused cannot be perpetrating or attempting to carry out a felony unless, at the time of the prohibited acts, he has formed the intent to commit the felony. . . ." *Spallone,* 406 A.2d at 1147; *see also Legg,* 417 A.2d at 1154. As in California, *see People v. Green, supra,* the definition of robbery under Pennsylvania law materially conflicts with the definition of robbery under Maryland law as explained in *Stebbing,* 299 Md. at 353, 473 A.2d 903; thus the theoretical basis for the Pennsylvania court's decisions in *Spallone* and *Legg* is inapplicable to the instant case. *Compare People v. Davis,* 173 Ill.App.3d 300, 123 Ill.Dec. 89, 95–96, 527 N.E.2d 552, 558–59, *appeal denied,* 123 Ill.2d 561, 128 Ill.Dec. 894, 535 N.E.2d 405 (1988) (stating that court should not require foreseeability of death if it is not an element of felony murder under the statute).

The decision of the Court of Appeals of New York in *People v. Joyner,* holding that murder is not committed in the course of robbery if the defendant did not kill for the purpose of robbing the victim, 308 N.Y.S.2d at 841–43, 257 N.E.2d at 27–28, is distinguishable from the present case on the same grounds as *People v. Green, supra,* and *Commonwealth v. Legg, supra.*

Finally, we need not discuss the decision of the Court of Appeals of Michigan in *People v. Goddard,* since that court cited only *People v. Green, supra,* and *Commonwealth v. Legg, supra,* in support of its conclusion that the "[d]efendant must intend to commit the felony at the time the killing occurs," to be convicted of felony murder. 352 N.W.2d at 371.

## III.

Appellant contends that the trial judge erred in denying his motion to suppress his tape recorded statement, asserting that

the statement was obtained in violation of his *Miranda* rights. This issue was addressed in appellant's first appeal to this Court, *Higginbotham I,* slip op. at 9–16. We held that appellant knowingly, intelligently, and voluntarily waived his *Miranda* rights and that, as a result, his statement was admissible. *Id.* at 16. We find no reason to reach any other conclusion in this appeal.

■ In reviewing the trial court's denial of a motion to suppress, we consider only the record of the suppression hearing and not of the trial itself. *Jackson v. State,* 52 Md.App. 327, 332 n. 5, 449 A.2d 438, *cert. denied,* 294 Md. 652 (1982). Although we make our own independent constitutional determination of whether the confession was admissible, "[w]hen the facts are in dispute, we accept them as found by the trial judge unless he is clearly erroneous in his judgment on the evidence before him." *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990).

In *Hoey v. State,* 311 Md. 473, 480, 536 A.2d 622 (1988), the Court of Appeals set forth the following analysis for determining whether a defendant's confession is admissible at trial:

> In Maryland, a defendant's confession is only admissible if it is (1) voluntary under Maryland nonconstitutional law, (2) voluntary under the Due Process Clause of the Fourteenth Amendment of the United States Constitution ..., and (3) elicited in conformance with the mandates of *Miranda.*

(Footnote and citations omitted.) Because appellant does not contest the voluntariness of his confession under Maryland nonconstitutional law or under the Due Process Clause of the Fourteenth Amendment of the United States Constitution, we need not address these issues.

■ A defendant's waiver of his rights under *Miranda* must be uncoerced and be made knowingly and intelligently to be valid. *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1140–41, 89 L.Ed.2d 410 (1986); *Hof v. State,* 97 Md.App. 242, 295, 629 A.2d 1251 (1993), *aff'd,* 337 Md. 581, 655 A.2d 370 (1995). Appellant does not assert that his confession was coerced, nor is there evidence indicating the existence of

coercion. Appellant's lone assertion is that, because he "was unable to pronounce or understand approximately ten different words [contained within the *Miranda* warnings], including 'attorney,' 'absolute,' 'explanation,' 'decision,' and 'appoint,'" he did not understand his *Miranda* warnings and therefore did not knowingly waive them. We shall address only that contention.

For a waiver to have been made knowingly and intelligently, it "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Burbine,* 475 U.S. at 421, 106 S.Ct. at 1141. The suspect must have known that "he could stand mute and request a lawyer," and that the State intended to use his statements to secure a conviction. *Id.* at 422–23, 106 S.Ct. at 1141–42. We believe that, in the present case, there was sufficient evidence produced during the suppression hearing to support the hearing judge's conclusion that appellant was mentally capable of understanding his rights and the consequences of waiving them.

Appellant was twenty-seven years of age at the time of the confession and had been exposed to the police and the criminal justice system on at least one other occasion. He had a ninth grade education, and he stated that he could read and write. In advising appellant of each of his *Miranda* rights, which were separately listed on the waiver form, Detective Childs utilized the following procedure:

After filling out the top of the form ... I give the original to the defendant with a different color pen, different than mine. And a lot of times, when you ask the defendant or a suspect if he can read and write, they say yeah, because they are embarrassed if they cannot. So my procedure is to let the individual read it to me so that I know that he can read it and that he understands it.

As he reads each line, I use a copy of the same form, and if he misses any words, I underline the word and then I ask him if he knows what the word means. If he cannot [sic],

then I give him a definition and I write the definition that I give him above the [word] that he cannot pronounce.

At the end of each line, I ask him if he understands the line, and if he acknowledges that he does, I ask him to write the word yes, indicating only that he understands the line and then to put his initials, and that's the procedure that I follow for each line.

Whenever appellant had difficulty pronouncing or comprehending a word contained in the *Miranda* warnings, Detective Childs explained the meaning of the word to appellant until he stated that he understood it. Appellant then indicated that he understood the meaning of his *Miranda* warnings by writing his initials next to each line of text on the waiver form. Detective Childs repeated this process prior to appellant's taped confession. The trial court found, and we agree, that appellant's difficulty with certain words "related more to the pronunciation of those words, rather than the conceptualizing of the ideas...." We conclude that, with Detective Child's assistance, appellant was aware of the rights that he was waiving and the consequences of doing so.

Appellant's reliance on the decision of the Supreme Court of Illinois in *People v. Bernasco*, 138 Ill.2d 349, 150 Ill.Dec. 155, 562 N.E.2d 958 (1990), *cert. denied*, 500 U.S. 932, 111 S.Ct. 2052, 114 L.Ed.2d 458 (1991) is misplaced. In that case, the trial judge found that the seventeen-year-old

defendant had no prior criminal experience and had a beginning fourth-grade reading and comprehension level that prevented him from "understand[ing] what was happening here and ... hav[ing] a knowing understanding of what was happening," so that he could not effectively waive his *Miranda* rights "without the aid of his parents or someone who would assist him in translating what was happening."

*Id.* 150 Ill.Dec. at 160, 562 N.E.2d at 963. A psychologist then testified that Bernasco probably was unable to understand the terms "statements" or "legal rights" in the context of his *Miranda* warnings. *Id.* 150 Ill.Dec. at 160–61, 562 N.E.2d at

963–64. In stark contrast, appellant in the present case was an adult with prior experience with the criminal justice system, was able to read at a ninth grade level, and, as a result of the assistance of Detective Childs, did understand both the meaning of the terms used in his *Miranda* warnings and the consequences of waiving those protections at the time of his confession. *Bernasco* is distinguishable on its facts and, therefore, we find it to be unpersuasive.

## IV.

 Appellant's final contention is that the circuit court erred in convicting and sentencing him separately on his conviction for first degree felony murder and his conviction for attempted robbery with a dangerous weapon. The State concedes that the lower court erred, and we agree.

Generally, separate convictions and sentences imposed for first degree felony murder, Maryland Code (1957, 1992 Repl. Vol.), Art. 27, §§ 408–10, and the underlying felony "violate the double jeopardy clause, since proof of the commission of the underlying felony is an essential element in the crime of felony murder." *Humphrey v. State*, 39 Md.App. 484, 495, 386 A.2d 1238, *cert. denied* 283 Md. 733 (1978) (citing *Newton v. State*, 280 Md. 260, 273–74, 373 A.2d 262 (1977)). In the case *sub judice*, the crime of attempted robbery with a dangerous weapon served as the underlying felony for appellant's felony murder conviction. The circuit court, therefore, erred by failing to merge the attempted robbery conviction into the first degree murder conviction, *Humphrey*, 39 Md.App. at 495, 386 A.2d 1238, and sentence appellant only for the felony murder conviction, *State v. Lancaster*, 332 Md. 385, 392, 631 A.2d 453 (1993) (citations omitted). Accordingly, we must vacate the sentence imposed for the attempted robbery with a dangerous weapon. *See Newton*, 280 Md. at 274, 373 A.2d 262.

JUDGMENT ON CHARGE OF FIRST DEGREE FELONY MURDER AFFIRMED. SENTENCE IMPOSED ON CONVICTION OF ATTEMPTED ROBBERY WITH A DANGEROUS AND DEADLY WEAPON VACATED.

COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–HALF BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.