875 A.2d 724

STATE of Maryland

v.

Jeffrey Edward ALLEN.

No. 104, Sept. Term, 2004.

Court of Appeals of Maryland.

June 10, 2005.

until 2008, we caution the court to be careful in the kinds of declarations and orders it issues.

Devy Patterson Russell, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for petitioner.

Stacy W. McCormack, Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

RAKER, J.

Jeffrey Edward Allen was convicted of first degree felony-murder in the Circuit Court for Charles County. The Court of Special Appeals reversed his conviction on the grounds that a defendant cannot be found to have committed felony-murder on the basis of a determination that he formed the intent to rob the victim only *after* he inflicted the fatal injuries. *Allen v. State,* 158 Md.App. 194, 857 A.2d 101 (2004). We granted the State's petition for writ of certiorari to decide the following question:

"Can a defendant be found guilty of felony-murder, even if he did not form the intent to steal until after the application of force that resulted in the victim's death, so long as the taking of personal property was 'part and parcel' of the same episode, and if so, did the Court of Special Appeals err in reversing Allen's conviction of felony-murder because the court so instructed the jury?"

*State v. Allen,* 384 Md. 448, 863 A.2d 997 (2004). We agree with the Court of Special Appeals and shall affirm the judgment of that court.

I.

In the late evening of October 23, 2001, a car pulled up next to respondent Jeffrey Edward Allen near the corner of 5th and H Streets, N.W., Washington, D.C. Allen was aware that this neighborhood ("The Stroll") was a frequent meeting place for men, and he had "a pretty good idea" of why a car would stop next to him. One or more of the vehicle's three occupants asked Allen if he wished to go with them to La Plata, Charles County, Maryland. Allen agreed and got into the car.

After stopping to pick up another individual, the vehicle proceeded to a residence in La Plata, where it discharged three of the passengers. The driver, John Butler, agreed to meet one of the departing passengers at 9:00 the following morning to attend a funeral. Butler and Allen then continued on to Butler's residence in Port Tobacco, Charles County.

Butler and Allen engaged in consensual sex and fell asleep on Butler's bed.

Allen described the next morning's events three times: in an oral statement to police, in a written statement to police, and in his testimony at trial. These accounts were relatively consistent with one another. According to Allen, he awoke around 9:00 a.m. and asked Butler if he still planned to attend the funeral. Butler replied that he did not, which upset Allen because he wanted to leave the house. Butler told Allen to "chill out" in the kitchen and have a beer. Allen went to the kitchen and opened the refrigerator, in which he discovered a live rat. This discovery increased Allen's desire to leave, and he asked Butler to get up and drive him back to Washington, D.C. Butler remained in bed.

In his written statement Allen told police:

"So I tried again to get him up, and he just wouldn't get up. So I thought I saw his keys on the stove, so I thought if he heard the keys jingling, and I told him I'd drive myself out of here, I thought that would make him get up. So I picked the keys up and said that I'll drive this mother fucker out of here myself. So I picked the keys up and they jingled, and I heard him say wait a minute dammit. And I heard something like some fidgeting or something, so I headed back toward the room where he was. And as I was headed in, he was headed out to where he was. He [had] the blanket draped over his arm . . . and he had it not balled up, but draped over and it was lifted up and he was carrying it like, it wasn't like it was balled up, but it was picked up. And when I saw that, I threw the keys down, well I dropped the keys, and looked on top of the refrigerator and saw some knives. I just reached up there and grabbed the knife, then he came at me with his left arm up, under the blanket. And I went and pushed him, I pushed him back into the room. And his arm was still up like he was trying to grab me or something, he fell down to the bed, and looking up I could still see his arm coming, then I just kept stabbing him. . . . So I ran toward the telephone, and re-membered him telling me that the telephone was not on.

So I ran into the kitchen and picked up the car keys off the floor, ran out the door, and got into the car and drove off. I was scared, I didn't know where I was, and really at the time, what to do."

Consistent with this statement, Allen testified at trial that he had not intended to take Butler's car when he jingled the keys or during the ensuing struggle.

While looking for a place to call the police, Allen lost control of Butler's car and ran it into a ditch. He flagged down a passing motorist, who drove him to a fire station. Finding no one there, the motorist took Allen to a store in Ironsides, Charles County, where Allen proceeded to call 911. In his 911 call, Allen reported a slightly different version of events vis-à-vis his movements with the car keys: "[T]hen he said, well I'm not taking you home. So I grabbed the keys, it, which was in the, in the kitchen and I was going outside to the car and he came at me."

Butler died of his injuries, and Allen was indicted by the Grand Jury for Charles County. He was tried by a jury in the Circuit Court for Charles County for first degree premeditated murder, first degree felony-murder, second degree murder, robbery with a dangerous or deadly weapon, robbery, theft, and two counts of carrying a weapon openly with intent to injure. At trial, the court instructed the jury as follows on the crimes of first degree felony-murder and robbery:

"There is a statute meaning an enactment of the legislature which says that if you cause or if a murder is caused by your involvement in the commission of any of a list of felonies then that is first degree murder regardless of what your intention was, regardless of whether you were the individual whose act caused the death, period.

Regardless of what you intended other than in connection with the commission of that felony. Suffice it to say for our purposes in this case robbery is one of the felonies on that list. To convict the defendant of first degree felony-murder in this case, the State must prove that the defendant committed robbery, that his project involv[ing] the robbery

resulted in the killing of John Butler, it is abbreviated here but the principle applies regardless of how many people are involved, and lastly that the act resulted in death. That is what I was talking about a second ago occurred during the commission of that robbery.

As I said also felony-murder does not require the State to prove that the defendant intended the victim's death. On[ly] that it resulted from the robbery project.

Okay. Let's talk about robbery, which is on the next page. Robbery is the taking of personal property from another person or from his presence and his control by force or the threat of force, with intent to steal the property.

The elements are pretty simple and straightforward. To convict someone of robbery the Government must prove that the defendant in this case took the car and keys from Mr. Butler or from his presence and control and they have to prove that he did so by force or the threat of force and that in doing so he intended to steal the property, that is to deprive John Butler of the property. . . . That they intended to deprive him of the property. . . . Acts inconsistent with the other person's right to own or possess.

*Because there was a death here we throw in the additional language* at the bottom of that page, or the bottom of that other language, *even if the intent to steal here was not formed until after the victim had died taking his property thereafter would still be robbery, if it was part and parcel of the same occurrence which involved the death."* (Emphasis added.)

Defense counsel objected to the instruction, particularly the italicized portion.

The jury convicted Allen of first degree felony-murder, second degree murder, robbery with a dangerous or deadly weapon, robbery, theft, and the two weapons counts. It found him not guilty of first degree premeditated murder. The court sentenced Allen to life in prison without the possibility of parole on the first degree felony-murder count, and to a term of imprisonment of thirty years for second degree murder,

twenty years for robbery with a deadly weapon, and three years for each weapons count, all to be served concurrently.[1]

Allen noted a timely appeal to the Court of Special Appeals. He argued, *inter alia,* that the court erroneously instructed the jury that the requisite connection between the use of force and intent to deprive the victim of property was satisfied as long as the two were "part and parcel of the same occurrence which involved the death." According to Allen, the trial court's instruction was an inaccurate statement of the law regarding robbery, which affected his robbery and first degree felony-murder convictions. The State argued that the instruction was a correct statement of the law.

The Court of Special Appeals reversed Allen's first degree felony-murder conviction. The court held as follows:

"[A]n 'afterthought' robbery . . . cannot support a conviction for felony murder. Put another way, appellant could not be found to have committed felony-murder on the basis of a determination that he formed the intent to rob the victim only *after* he inflicted the fatal injuries. It follows that the court erred by instructing the jury that appellant could be found guilty of felony-murder 'even if the intent to steal here was not formed until after the victim had died,' because 'taking his property thereafter would still be robbery, if it was part and parcel of the same occurrence which involved the death.'

\*      \*      \*

Because we have no way of knowing whether the jury unanimously agreed that appellant formed the intent to rob prior to or while in the commission of the murder, we cannot sustain the felony-murder conviction."

*Allen,* 158 Md.App. at 246–47, 857 A.2d at 132.

## II.

■ In Maryland, in a criminal case, upon request of a party, the trial court is required to instruct the jury as to the

---

1.  The court merged the robbery and theft convictions into the conviction for robbery with a deadly weapon.

law applicable to the case. *See* Md. Rule 4–325(c). The main purpose of jury instructions is to aid the jury in understanding the case, to guide the jury's deliberations, and to help the jury arrive at a correct verdict. *Chambers v. State*, 337 Md. 44, 48, 650 A.2d 727, 729 (1994).

Reduced to its essence, the jury instruction at the heart of this case stated as follows: (1) If a death resulted from the defendant's commission of an enumerated felony, the defendant is guilty of first degree murder regardless of whether he intended to cause the death; (2) Robbery is an enumerated felony; (3) Robbery is the taking of personal property from a person or that person's presence by force or the threat of force, with intent to steal the property; (4) Stealing the property of a dead victim is robbery even if the intent to steal is not formed until after the victim has died, so long as the stealing is "part and parcel of the same occurrence which involved the death."

Under this instruction, the jury was permitted to find Allen guilty of first degree felony-murder if it concluded that he had intentionally robbed Butler and that Butler's death had resulted from the robbery. The jury was permitted to find that Allen had robbed Butler even if it determined that he had formed the intent to steal the car only after Butler's death, in other words, that he had committed what is known as an "afterthought robbery."

■ We must determine whether the instruction given in this case correctly stated the law of Maryland as to felony-murder. We answer that question in the negative, and hold that a defendant is guilty of first-degree felony-murder only if the defendant's intent to commit the predicate enumerated felony arises prior to, or concurrent with, the conduct resulting in death.

First degree felony-murder is codified at Md.Code (2002, 2004 Cum.Supp.), § 2–201(a) of the Criminal Law Article.[2] That section provides, in pertinent part, as follows:

---

**2.** Unless otherwise indicated, all subsequent statutory references will be to Md.Code (2002, 2004 Cum.Supp.), Criminal Law Article.

"A murder is in the first degree if it is:

\*      \*      \*

(4) committed in the perpetration of or an attempt to perpetrate:

(i) arson in the first degree;

(ii) burning a barn, stable, tobacco house, warehouse, or other outbuilding that:

1. is not parcel to a dwelling; and

2. contains cattle, goods, wares, merchandise, horses, grain, hay, or tobacco;

(iii) burglary in the first, second, or third degree;

(iv) carjacking or armed carjacking;

(v) escape in the first degree from a State correctional facility or a local correctional facility;

(vi) kidnapping under § 3–502 or § 3–503(a)(2) of this article;

(vii) mayhem;

(viii) rape;

(ix) robbery under § 3–402 or § 3–403 of this article;

(x) sexual offense in the first or second degree;

(xi) sodomy; or

(xii) a violation of § 4–503 of this article concerning destructive devices."

In order to sustain a conviction in this case under § 2–201, the State must prove, beyond a reasonable doubt, a robbery or attempted robbery, and a murder "committed in the perpetration of or an attempt to perpetrate" a robbery or attempted robbery. The question of whether a felony committed as an "afterthought" to a killing may be the predicate for a felony-murder has been considered by many courts around the country. The majority view is that in order for a conviction for felony-murder to be sustained, the defendant must have intended to commit the underlying felony at the time the killing occurs. Under the majority view, there can be no felony-murder conviction when the felony occurs as an after-

thought following the killing. *See e.g., United States v. Bolden,* 514 F.2d 1301, 1309 (D.C.Cir.1975); *Ex parte Johnson,* 620 So.2d 709, 713 (Ala.1993); *Grigsby v. State,* 260 Ark. 499, 542 S.W.2d 275, 280 (1976); *People v. Ainsworth,* 45 Cal.3d 984, 248 Cal.Rptr. 568, 755 P.2d 1017, 1037 (1988); *People v. Brannon,* 194 Mich.App. 121, 486 N.W.2d 83, 85–86 (1992), *app. denied,* 441 Mich. 887, 495 N.W.2d 384 (1992); *State v. Montgomery,* 191 Neb. 470, 215 N.W.2d 881, 884 (1974); *People v. Joyner,* 26 N.Y.2d 106, 308 N.Y.S.2d 840, 257 N.E.2d 26, 27 (1970); *Commonwealth v. Legg,* 491 Pa. 78, 417 A.2d 1152, 1154 (1980); *State v. Buggs,* 995 S.W.2d 102, 106 (Tenn. 1999); *Robertson v. State,* 871 S.W.2d 701, 705 (Tex.Crim.App. 1993).

■ Although the State need not prove that the defendant intended to commit murder, it must establish that the defendant intended to commit the predicate felony. Underlying this requirement is the purpose of the modern felony-murder rule. The purpose underlying the modern felony-murder rule is one of deterrence; the rule is intended to deter dangerous conduct by punishing as a first degree murder a homicide resulting from dangerous conduct in the perpetration of a felony, even if the defendant did not intend to kill. *See Roary v. State,* 385 Md. 217, 226–27, 867 A.2d 1095, 1100 (2005). As one commentator has explained:

"The primary justification offered for the contemporary felony-murder rule is deterrence. The doctrine is allegedly designed to save lives by threatening potential killers with the serious sanction for first or second degree murder. One deterrent argument holds that the threat of a murder conviction for any killing in furtherance of a felony, even an accidental killing, might well induce a felon to forego committing the felony itself. Because it could lead to quite severe punishment, the risk averse might shy away from the entire felonious enterprise. Another argument, the more prevalent of the two main deterrent explanations of felony-murder, maintains that the rule is aimed at discouraging certain conduct during the felony, not the felony itself. The goal is to encourage greater care in the performance of

felonious acts. Such care will lower the risks to human life and result in fewer deaths. Still another view suggests that felons who might kill intentionally in order to complete their felonies successfully will be discouraged by the rule's proclamation that the law will entertain no excuses for the homicide. Calculating felons will forego killing because of their awareness that the chance of constructing a defense that would eliminate or mitigate liability is virtually nonexistent and that, therefore, their likely fate is a murder conviction."

James J. Tomkovicz, *The Endurance of the Felony–Murder Rule: A Study of the Forces that Shape Our Criminal Law,* 51 Wash. & Lee L.Rev., 1429, 1448–49 (1994). *See also* Kevin Cole, *Killings During Crime: Toward a Discriminating Theory of Strict Liability,* 28 Am.Crim. L.Rev. 73, 96–97 (1990).

The minority view holds that a killing may be a felony-murder where the intent to commit the underlying felony arises after the victim is dead, so long as there is a continuity of action to constitute one continuous transaction. *See State v. Williams,* 74 Ohio St.3d 569, 660 N.E.2d 724, 732–33 (1996); *Hightower v. State,* 901 P.2d 397, 402 (Wyo.1995). Some courts adhering to this "broad view" apply a *res gestae* theory, reasoning that if the act causing the death is part and parcel of the same occurrence or transaction as the felony, then a felony-murder conviction is proper. *See Perry v. State,* 853 P.2d 198, 200 (Okla.Crim.App.1993); *Haskell v. Commonwealth,* 218 Va. 1033, 243 S.E.2d 477, 482 (1978). *See also Francis v. State,* 266 Ga. 69, 463 S.E.2d 859, 860–61 (1995).

The minority view was adopted by the Court of Special Appeals in *Higginbotham v. State,* 104 Md.App. 145, 158–59, 655 A.2d 1282, 1288 (1995). The *Higginbotham* court's holding was based on its reading of *Stebbing v. State,* 299 Md. 331, 473 A.2d 903 (1984), that a robbery conviction is proper "if there be force followed by a taking with intent to steal as part of the same general occurrence or episode," as well as a finding that the Maryland felony-murder statute contains no explicit requirement that the intent to commit the underlying felony must exist prior to the commission of the act causing the death of the victim. *Id.* at 158–59, 655 A.2d at 1288–89.

This Court disapproved of *Higginbotham* in *Metheny v. State*, 359 Md. 576, 755 A.2d 1088 (2000), wherein we stated that "[w]e believe *Higginbotham* went too far in stretching the scope of the felony-murder doctrine beyond its traditional foundation in Maryland and that it perhaps misconstrues *Stebbing.*" *Id.* at 631 n. 23, 755 A.2d at 1118 n. 23. We disagree with *Higginbotham* and hereby overrule it.

The Supreme Court of Tennessee explained the split in authority and the logical inconsistency of the minority view in light of the deterrence and malice rationales of the felony-murder rule as follows:

"Where the killing precedes the commission of the felony, . . . there is a split of authority between the various jurisdictions as to whether intent to commit the felony must exist concurrent with the commission of the homicide, or whether intent formed after a killing is nonetheless sufficient to bring a case within the felony-murder rule.

The prevailing view is that in order for the felony-murder doctrine to be invoked, the actor must intend to commit the underlying felony at the time the killing occurs; there is no felony-murder where the felony occurs as an afterthought following the killing.

The rationale for the felony-murder rule underlies the requirement of intent in [these] jurisdictions. As we stated in *State v. Kimbrough*, 924 S.W.2d 888 (Tenn.1996):

'One of the original purposes of the felony-murder rule was to deter the commission of certain felonies in a dangerous or violent way. Felony murder differs from other forms of murder because it holds the actor strictly accountable even where the killing is unintended.'

\*　　\*　　\*

If an accused had no intent to commit the underlying felony at the time of the killing, the basis for the felony-murder rule does not apply.

A minority of jurisdictions, however, hold that a killing will constitute felony murder even if the intent to commit the underlying felony arises after the murderous act, if

there is a continuity of action so as to constitute one continuous transaction. These latter cases tend to apply a *res gestae* theory; if the act causing death is "part and parcel" of the same occurrence or episode as the felony, then a felony-murder conviction is justified. Particularly with respect to robbery-murder, if the act causing the death of the victim also constituted the element of force in the robbery, then the act of murder is considered a part of the underlying felony.

We agree with the majority position. Given the fact that the felony-murder rule is a legal fiction in which the intent and the malice to commit the underlying felony is 'transferred' to elevate an unintentional killing to first-degree murder, we are reluctant to extend the doctrine to include cases in which there was no intent to commit the felony at the time of the killing. Thus, in a felony-murder case, intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim."

*State v. Buggs,* 995 S.W.2d 102, 106–07 (Tenn.1999) (citations omitted).

*Commonwealth v. Legg,* 491 Pa. 78, 417 A.2d 1152 (1980), also reflects the majority, "narrow" view.[3] In that case, the Supreme Court of Pennsylvania stated as follows:

"When an actor engages in one of the statutorily enumerated felonies and a killing occurs, the law, via the felony-murder rule, allows the finder of fact to infer the killing was malicious from the fact that the actor engaged in a felony of such a dangerous nature to human life because the actor, as held to a standard of a reasonable man, knew or should have known that death might result from the felony. Additionally, a greater penalty is imposed for murder of the second

---

**3.** The facts of *Legg* are strikingly similar to those in the instant case. Howard Legg and his victim James Bell rode around in Bell's car with several other men before returning to Bell's home for consensual sex. Legg then stabbed Bell to death and drove off with the car. *Legg,* 417 A.2d at 1153–54.

degree or felony murder, than that imposed for murder of the third degree even though the latter also is malicious. In so providing, the law seeks to add a greater deterrent to engaging in particularly dangerous felonies.

But, where an actor kills prior to formulating the intent to commit the underlying felony, we cannot say the actor knew or should have known death might occur from involvement in a dangerous felony because no involvement in a dangerous felony exists since the intent to commit the felony is not yet formulated. Also, the greater deterrent is not necessary, and the rule has no application."

*Id.* at 1154 (citations omitted).

We agree with the majority view expressed by the courts of this country. In order to sustain a conviction for felony-murder, the intent to commit the underlying felony must exist prior to or concurrent with the performance of the act causing the death of the victim. An afterthought felony will not suffice as a predicate for felony-murder.

Application of the felony-murder rule where the intent to commit the felony arises after the conduct resulting in death conflicts with a primary theoretical underpinning of the rule. A murder is a malicious killing; it is the mental state of malice that transforms a homicide into the crime of murder. Under the felony-murder rule, the malice involved in the underlying felony is permitted to stand in the place of the malice that would otherwise be required with respect to the killing. Judge Charles E. Moylan, Jr., has explained the theory and its history as follows:

"The common law felony-murder doctrine solidified in the late 1500's and very early 1600's as the expression of one of the forms of implied malice. To constitute murder at that time, it was necessary that a homicide be committed with 'malice,' to wit, with an intent to kill. In its earlier manifestation, the notion was that the intentional perpetration or attempted perpetration of a life-endangering felony implied the intent to kill so as to make any homicide resulting from the felony or attempted felony an instance of murder. Our

current analysis, of course, is that the intended perpetration of the felony is an independent murderous *mens rea*, should death result, and is just as blameworthy and just as worthy of punishment as murder as would be the specific intent to kill. 'It is not the case that these mental states *imply* malice; it is rather the case that they *are* malice by definition.' The transformation from an evidentiary phenomenon to a substantive phenomenon did not alter the end result."

Charles E. Moylan, Jr., *Criminal Homicide Law* § 5.1 at 105 (2002) quoting *Evans v. State*, 28 Md.App. 640, 700, 349 A.2d 300 (1975), *aff'd*, 278 Md. 197, 362 A.2d 629 (1976). The felony-murder rule has been justified because the defendant is acting maliciously at the time he kills, even if the object of his malice is unrelated to the victim's death. But where the fatal blow is struck without any contemporaneous intent to commit the underlying felony, the *mens rea* is absent, and thus, the theoretical foundation for the felony-murder rule is absent.

In addition, as we have discussed *supra*, the deterrence justification underlying the rule is to cause felons to exercise more care while committing dangerous felonies so as to avoid killing someone. If the victim is dead when the intent to commit the felony is formed, the deterrent purpose underlying the rule cannot be served.

Our holding today also resolves a question we raised but did not answer in *Metheny v. State*, 359 Md. 576, 755 A.2d 1088 (2000). In *Metheny*, a capital case, we construed the Maryland death penalty statute, then found at Md.Code (1957, 1996 Repl.Vol., 1999 Cum.Supp.), Art. 27 § 413(d)(10), currently codified as § 2–303(g)(1)(x) of the Criminal Law Article, and considered whether the evidence supported the finding of the statutory aggravator of robbery. Section 2–303(g)(1) provides, in pertinent part:

"In determining a sentence under subsection (b) of this section [*Imposition of death penalty—Sentencing proceeding*], the court or jury first shall consider whether any of

the following aggravating circumstances exists beyond a reasonable doubt:

\*     \*     \*

(x) the defendant committed the murder while committing, or attempting to commit:

\*     \*     \*

4. robbery under § 3–402 or § 3–403 of this article."

The evidence in *Metheny* indicated that "the consummated crime of murder occurred before the intent arose to deprive permanently the victim of her clothing and purse," *i.e.* that "the predicate felony aggravator, robbery, was an afterthought to the murder of the victim." *Metheny,* 359 Md. at 618, 755 A.2d at 1111.

We held that Metheny had not murdered the victim "while committing, or attempting to commit" a robbery within the meaning of § 2–303. *Id.* at 615, 755 A.2d at 1109. We reasoned as follows:

> "[A]s a matter of statutory interpretation, . . . the General Assembly's use of the phrase 'while committing or attempting to commit' . . . conveys a legislative intent that a murder, in order to qualify for punishment by death, must have been connected to the aggravating crime by more than mere coincidence, therefore eliminating from death penalty consideration a robbery committed as an afterthought."

*Id.* at 618, 755 A.2d at 1111.

We noted in *Metheny* that we were "not presented with, and thus shall not decide, the question whether an 'afterthought' to commit a felony, specifically the intent to rob indisputably formed after a murder, is encompassed by the felony-murder rule and thus may underlie a felony-murder conviction." *Id.* at 623, 755 A.2d at 1114. Nonetheless, as guidance to assist us in ascertaining the meaning of the statutory language "committing or attempting to commit," we looked to cases around the country interpreting the felony-murder rule and the interpretation of the language "perpetrating." We concluded that "committing" and "perpetrating" have similar, if

not synonymous meanings. *Id.* We quoted from and cited with approval those cases around the country that embraced the majority view of felony-murder—that there can be no felony-murder where the felony occurs as an afterthought following the killing. *Id.* at 620–26, 755 A.2d at 1112–16. For purposes of capital murder, we then held that "[b]ecause the intent to steal was formed after the murder, a rational trier of fact could not have found that Appellant murdered Ms. Magaziner while committing the robbery." *Id.* at 631, 755 A.2d at 1119.

■ The question of whether the defendant had the intent to kill at the time of the taking is usually a jury question and the jury may infer from the facts and circumstances that a robbery began when the accused attacked the victim. In the instant case, there was evidence from which, if believed, a jury could have concluded that the robbery in this case was committed as an afterthought to the killing. Under the instructions given at respondent Jeffrey Allen's trial, the jury could have convicted Allen of first degree felony-murder even if it determined that his intent to steal John Butler's car arose only after Allen had stabbed Butler. Respondent is entitled to a new trial.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY CHARLES COUNTY.*