*Dawnta Harris v. State of Maryland*, No. 45, September Term, 2021. Opinion by Hotten, J.

**CRIMINAL LAW — FELONY MURDER — MANSLAUGHTER BY VEHICLE — PREEMPTION**

A felony murder conviction, when perpetrated by the operation of a motor vehicle, is not preempted by the manslaughter by vehicle statute, Md. Code Ann., Criminal Law ("Crim. Law") § 2-209. That statute preempts the entire subject matter of unintended homicides committed by motor vehicle, but felony murder is not an unintended homicide. Rather, felony murder is a legal fiction whereby the intent to commit the underlying felony is transferred to the intent necessary to support a conviction for first-degree murder. Permitting Crim. Law § 2-209 to preempt certain killings that occur in furtherance of a felony, simply because they are perpetrated with a motor vehicle, would also thwart the rationale behind the felony murder rule, and is not supported by the legislative purpose behind the statute.

**CRIMINAL LAW — CRUEL AND UNUSUAL PUNISHMENT — JUVENILE LIFE SENTENCING —INDIVIDUALIZED CONSIDERATION**

As outlined in *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455 (2012), prior to sentencing a juvenile to life in prison without the possibility of parole, the Eighth Amendment of the United States Constitution requires the offender to receive an individualized sentencing proceeding wherein the sentencing court has discretion to impose a lesser sentence and can consider the offender's youth and attendant circumstance as mitigating factors. This heightened sentencing requirement only applies to juveniles who are sentenced to life in prison *without* the possibility of parole and is not constitutionally required for juveniles who receive a lesser sentence of life in prison *with* the possibility of parole.

**CRIMINAL LAW — CRUEL AND UNUSUAL PUNISHMENT — JUVENILE LIFE SENTENCING —INDIVIDUALIZED CONSIDERATION**

Article 25 of the Maryland Declaration of Rights is generally interpretated *in pari materia* with the Eighth Amendment of the United States Constitution. Article 25 does not afford any greater protection than the Eighth Amendment for sentencing procedures of juvenile offenders sentenced to life in prison with the possibility of parole.

IN THE COURT OF APPEALS

OF MARYLAND

No. 45

September Term, 2021

_____

DAWNTA HARRIS

v.

STATE OF MARYLAND

_____

*Getty, C.J.,
Watts,
Hotten,
Booth,
Biran,
Battaglia, Lynne A.
 (Senior Judge, Specially Assigned)
McDonald, Robert N.
 (Senior Judge, Specially Assigned)

JJ.

_____

Opinion by Hotten, J.

_____

Filed: June 8, 2022

*Getty, C.J., now a Senior Judge, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to Maryland Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

When he was sixteen years old, Dawnta Harris, Petitioner, skipped school and joined three teenage companions in driving a stolen Jeep to commit a series of burglaries in Baltimore County. In an attempt to evade Baltimore County Police Officer Amy Caprio, who had responded to the location of one of the burglaries, Petitioner drove the stolen Jeep into a neighborhood cul-de-sac. While Officer Caprio tried to prevent Petitioner from exiting the cul-de-sac, Petitioner ran her over with the Jeep and killed her. Petitioner was convicted by a jury in the Circuit Court for Baltimore County of first-degree felony murder, first-degree burglary, and the theft of the Jeep. He was sentenced to life in prison with the possibility of parole for the first-degree felony murder of Officer Caprio, plus twenty years and five years, respectively, for his convictions of first-degree burglary and theft of the Jeep, to be served concurrently with the life sentence.

After the Court of Special Appeals affirmed Petitioner's convictions, he filed a petition for writ of *certiorari* to this Court, presenting the following questions for our review:

1. As a matter of first impression, is a common law felony murder an unintended homicide that if perpetrated by the operation of a motor vehicle has been preempted by the manslaughter by automobile statute, thereby precluding the common law offense from serving as a basis for a crime in Maryland?

2. What is the scope of the individualized sentencing requirement for juveniles convicted of felony murder before they can be sentenced to life imprisonment with the possibility of parole, and did the intermediate court err in upholding Petitioner's life sentence with the possibility of parole that was imposed without considering Petitioner's youth, attendant circumstances, and penological justifications of a life sentence upon a juvenile for an unintentional killing?

We granted *certiorari* and, as explained in detail below, answer the first question in the negative. Pertaining to the second question, we determine that the Eighth Amendment does not impose an individualized sentencing requirement for juveniles sentenced to life imprisonment with the possibility of parole. We therefore affirm the decision of the Court of Special Appeals.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Underlying Incident

On May 21, 2018, Petitioner skipped school and committed a series of day-time burglaries in Baltimore County with three other teenagers, utilizing a black Jeep Wrangler that had been stolen three days prior. Officer Amy Caprio of the Baltimore County Police Department arrived at a home on Linwen Way in the Parkville Area of Baltimore County, in response to a 911 call by a neighbor who had reported unfamiliar individuals walking around the periphery of the house and looking into its windows. Petitioner stayed in the Jeep outside the Linwen Way home while his companions walked around the house. When Petitioner observed Officer Caprio's vehicle approaching, he drove away.

Officer Caprio followed the Jeep, which drove into a cul-de-sac in the neighborhood. She positioned her vehicle before getting out, so that it was partially blocking the exit of the cul-de-sac. The Jeep turned around at the end of the cul-de-sac and drove directly towards Officer Caprio. Officer Caprio drew her weapon and ordered Petitioner to stop and get out of the Jeep. Initially, the Jeep stopped directly in front of Officer Caprio, and Petitioner opened the driver's side door. Officer Caprio stepped in

2

front of the Jeep, keeping her weapon drawn. Petitioner then shut the door, accelerated, struck Officer Caprio, and drove away. Officer Caprio fired one gunshot, which struck the front windshield of the Jeep at nearly the same moment she was hit by the Jeep. Neighbors who observed the incident rushed to Officer's Caprio's aid, and she was transported to the hospital, but ultimately died from her injuries.

Another neighbor, Christopher Squires, unaware of the above referenced events, observed a black Jeep with a bullet hole on the driver's side windshield travelling quickly down the street. He then observed the driver, who matched Petitioner's description, park and walk away from the vehicle without entering any house. The neighbor found this behavior suspicious and called the police. A police officer responding to that call picked up Petitioner walking in the neighborhood, and he was identified by Mr. Squires as the individual who abandoned the Jeep. Various stolen items were later recovered from inside the Jeep.

When interviewed by police, Petitioner initially denied knowing anything about the Jeep, but later changed his story. He told detectives that some of his friends showed up with the Jeep, that he did not know it was stolen, and that when they drove to various houses, he stayed in the car. He claimed that he did not know what his friends were doing, although he knew it was something that they were not supposed to be doing. Petitioner then alleged that, while waiting in the car, he saw a police officer approach and decided to drive off. He described turning around at the cul-de-sac and seeing a female police officer get out of her car and point a gun at him. He stated that he was too scared to get out of the

3

car, that he put his head down, closed his eyes, and could not hear what the officer was saying. Petitioner described the incident in the following way:

> [PETITIONER:] I couldn't really hear her. I did hear, "Get out of the car."
>
> DETECTIVE: Okay. All right [sic]. Did you get out of the car at any point?
>
> [PETITIONER:] No, I was too scared to get out.
>
> DETECTIVE: Did you start to get out of the car?
>
> [PETITIONER:] Yes, I did open the door.
>
> DETECTIVE: All right [sic]. Then what happened?
>
> [PETITIONER:] I was just too scared. I was paranoid, too paranoid, I didn't know what to do. I just did whatever came to my head, which to -- at least, try to pull off.
>
> \*     \*     \*
>
> [PETITIONER:] Yeah, but when I put my head down and closed my eyes, I didn't -- I didn't move the wheel. Like, I just --
>
> DETECTIVE: Well, you didn't do that in the beginning. I mean, you would have driven around in the car at first with your eyes open, or you would have never made it.
>
> [PETITIONER:] Correct, yeah.
>
> DETECTIVE: Okay.
>
> [PETITIONER:]: All I did was --
>
> DETECTIVE: Then she's in the way.
>
> [PETITIONER:] All I did was -- the car never got put back in park, it stayed in drive. So all I did was just put my head down because I had seen a gun that was pointed directly at me.
>
> DETECTIVE: Okay.

[PETITIONER:]  So, I had put my head down and I was just gripping the wheel -- the steering wheel, but I didn't want to pull off or anything.  I was just -- I don't know, I was getting even scareder [sic], and I ain't know what to do at all.

DETECTIVE:  Okay.

[PETITIONER:]  So, I had pulled straight off.

DETECTIVE:  Well, did you stop when you hit her?

[PETITIONER:]  No, I didn't even know I hit her.

DETECTIVE:  Well, you knew she was standing when you put your head down.

[PETITIONER:]  Yeah, I knew she was standing there, but I didn't know I hit her.

DETECTIVE:  That's when you hit the gas, you just put your head down and didn't look?

[PETITIONER:]  No, I didn't look at anything.  I was too scared to look, because I didn't know if I was gonna crash, hit the police car or hit the police, I didn't know if I was gonna get shot or not.

Petitioner was sixteen years old at the time of the incident.

## Legal Proceedings

### A.  Circuit Court Proceedings

Petitioner was charged in the Circuit Court of Baltimore County with first-degree felony murder, two counts of first-degree burglary, one count of fourth-degree burglary,

and theft of the Jeep.[1]  A jury trial was held between April 22, and May 1, 2019.  With respect to the first-degree felony murder, the State explained in closing that:

> It's not necessary for the State to prove the Defendant intended to kill.  The State has to prove that others participating in the crime with Defendant committed a felony, and that felony is first-degree burglary; Defendant killed Officer Caprio; the act resulting in the death of Officer Caprio occurred during the escape of the first-degree felony burglary.  Felony murder.

The jury instructions likewise specified that it was not necessary for the jury to find Petitioner intended to kill Officer Caprio in order to find him guilty of felony murder.[2]

Petitioner was found guilty of first-degree felony murder, one count of first-degree burglary, and the theft of the Jeep.[3]

---

[1] Petitioner was originally indicted with nineteen crimes, which included: first-degree felony murder, several counts of first-, third- and fourth-degree burglary, and theft, pertaining to various houses, theft of the stolen Jeep and stolen license plate, and related firearms charges.  Pursuant to the verdict sheet only the crimes of first-degree burglary (two counts), first-degree felony murder (one count), fourth-degree burglary (one count), and theft of the Jeep (one count) were submitted to the jury.

[2] The court instructed the jury as follows:

The Defendant is charged with the crime of first-degree felony murder.  It is not necessary for the State to prove that the Defendant intended to kill Amy Caprio.  In order to convict the Defendant of first-degree felony murder, the State must prove; one, that others participating in the crime with the Defendant committed a felony of first-degree burglary; two, that the Defendant killed Amy Caprio; and three, that the act resulting in the death of Amy Caprio occurred during the escape from the immediate [scene] of the felony first-degree burglary.

[3] Petitioner's three companions pled guilty to first-degree felony murder of Officer Caprio.  *See State v. Ward*, 03-K-18-002251 (Balt. Cty. Cir. Ct. May 30, 2018); *State v. Matthews*, 03-K-18-002252 (Balt. Cty. Cir. Ct. May 30, 2018); *State v. Genius*, 03-K-18-002253 (Balt. Cty. Cir. Ct. May 30, 2018).

A sentencing hearing was held on August 21, 2019, during which defense counsel presented mitigating evidence, including various references to Petitioner's young age, the negative influences in his life, his ability to change, as well as a letter written by Petitioner in which he described his own undeveloped decision-making due to his age. A pre-sentence investigation was also submitted, which provided, among other things, Petitioner's age, criminal history, personal history, current family situation, educational history, and mental health issues. The sentencing court stated that, "[h]aving considered the pre[-]sentence investigation, the victim impact [statement], the Defendant's prior record, the arguments of counsel, [and] the allocution[,]" it sentenced Petitioner to life in prison with the possibility of parole for the felony-murder conviction, twenty years for first-degree burglary, and five years for the theft of the Jeep, both to be served concurrently with his life sentence.

**B. The Opinion of the Court of Special Appeals**

Petitioner appealed to the Court of Special Appeals, which affirmed the circuit court in a reported opinion. *See Harris v. State,* 251 Md. App. 612, 661, 256 A.3d 292, 321, *cert. granted*, 476 Md. 417, 263 A.3d 512 (2021). The Court of Special Appeals rejected Petitioner's argument that the manslaughter by vehicle statute, Md. Code Ann., Criminal Law ("Crim. Law") § 2-209, which applies to unintended homicides committed with the

use of a motor vehicle, preempted Petitioner's felony murder of Officer Caprio.[4]  The Court

of Special Appeals reasoned that:

> [U]nder the felony-murder rule, the malice involved in the underlying felony
> is permitted to stand in the place of the malice that would otherwise be
> required with respect to the killing.  Felony murder is not, therefore, within
> the scope of unintended homicides.  Accordingly, felony murder is not
> preempted by the manslaughter by automobile statute when the homicide
> involves a motor vehicle.

*Id.* at 640, 256 A.3d at 308 (internal citations and quotations omitted).  The Court of Special

Appeals also observed that the jury was not asked to specifically find that the homicide of

Office Caprio was unintended, and that the facts and arguments presented by the State

could have permitted a finding that Petitioner did intentionally run over Officer Caprio.  *Id.*

at 640, 256 A.3d at 308–09.  The Court of Special Appeals concluded that this provided

another basis for rejecting Petitioner's preemption argument.  *Id.*, 256 A.3d at 309.

Petitioner also argued to the Court of Special Appeals that the sentence of life with

the possibility of parole for his felony murder conviction was unconstitutional under the

Eighth Amendment and Articles 16 and 25 of the Maryland Declaration of Rights, because

he failed to receive an individualized sentencing proceeding where youth and attendant

characteristics were considered.  *Id.* at 647, 256 A.3d at 312.  The Court of Special Appeals

rejected this argument, explaining that the Supreme Court precedent relied on by Petitioner

---

[4] While the Court of Special Appeals did not conclude, as Petitioner argued, that his
argument on this issue was preserved as a challenge to subject matter jurisdiction, the court
held that it could be brought as a potential challenge to the legality of his sentence and
reviewed the argument on those grounds.  *Harris*, 251 Md. App. at 636–37, 256 A.3d at
306–07.  The State does not argue against the Court of Special Appeals' holding as it
pertains to preservation of the issue in its brief to this Court, so we need not consider it.

8

pertains to sentences of life *without* parole, and thus was not applicable to Petitioner's sentence of life *with* parole. *Id.* at 653, 256 A.3d at 316. The court also held that, nevertheless, Petitioner received an individualized sentencing proceeding because a pre-sentence report was presented to the sentencing court, defense counsel provided evidence at the hearing pertaining to Petitioner's youth, and the sentencing court stated that "it had considered all the evidence and all factors." *Id.* at 657, 256 A.3d at 319.

Finally, the Court of Special Appeals rejected the claim that Petitioner's sentence was "grossly disproportionate" as applied under the Eighth Amendment. The Court of Special Appeals employed a two-step analysis from *Howard v. State*, 232 Md. App. 125, 175–76, 156 A.3d 981 (quoting *Thomas v. State*, 333 Md. 84, 95–96, 634 A.2d 1, 6 (1993)), *cert. denied*, 453 Md. 366, 162 A.3d 842 (2017) for determining proportionality of a sentence under the Eighth Amendment. *Id.* at 658–59, 256 A.3d at 320. The intermediate court held that Petitioner's conduct did not pass the first step of the proportionality test, reasoning that killing a police officer while fleeing the scene was "extremely serious," and concluding that "[g]iven that his conduct caused another person to lose her life, the life sentence does not appear grossly disproportionate." *Id.* at 659, 256 A.3d at 320.

## DISCUSSION

### I. Petitioner's Felony Murder Conviction Is Not Statutorily Preempted

#### A. Standard of Review

An issue pertaining to preemption—in this case, whether a criminal statute preempts a common law crime—is a question of law that we review *de novo*. *See Bd. of Cty.*

9

*Comm'rs of Washington Cty. v. Perennial Solar, LLC*, 464 Md. 610, 617, 212 A.3d 868, 872 (2019); *Chateau Foghorn LP v. Hosford*, 455 Md. 462, 482–83, 168 A.3d 824, 835–36 (2017); *Cty. Comm'rs of Kent Cty. v. Claggett,* 152 Md. App. 70, 91, 831 A.2d 77, 89 (2003), *aff'd sub nom. Worton Creek Marina, LLC v. Claggett,* 381 Md. 499, 850 A.2d 1169 (2004). Furthermore, this Court reviews *de novo* "the interpretation and application of Maryland constitutional, statutory and case law[.]" *Schisler v. State*, 394 Md. 519, 535, 907 A.2d 175, 184 (2006). When interpretating a statute,

> our primary goal is always to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional or part of the Rules. We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory. If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends. Occasionally we see fit to examine extrinsic sources of legislative intent merely as a check of our reading of a statute's plain language. In such instances, we may find useful the context of a statute, the overall statutory scheme, and archival legislative history of relevant enactments.

*Douglas v. State*, 423 Md. 156, 178, 31 A.3d 250, 263 (2011) (quoting *Evans v. State*, 420 Md. 391, 400, 23 A.3d 223, 228 (2011)).

### B. The Parties' Contentions

Relying on *State v. Gibson*, 4 Md. App. 236, 242 A.2d 575 (1968), *aff'd*, 254 Md. 399, 254 A.2d 691 (1969) and *Blackwell v. State*, 34 Md. App. 547, 369 A.2d 153, *cert. denied* 280 Md. 728 (1977), Petitioner argues that Maryland's manslaughter by motor

10

vehicle statute,[5] Crim. Law § 2-209, preempts all common law homicide charges based on an unintentional killing by a motor vehicle, including felony murder. He argues that, because "intent to kill" is not an element of felony murder, felony murder is an unintended homicide, and when committed with a motor vehicle, is preempted by Crim. Law § 2-209. Petitioner also asserts that the Court of Special Appeals violated his constitutional rights under the Fourteenth Amendment of the United States Constitution and Articles 21 and 23 of the Maryland Declaration of Rights by determining that his actions were not preempted by Crim. Law § 2-209 on the basis that the State made arguments and presented evidence at trial that could have supported the jury finding that Petitioner intentionally killed Officer Caprio. He argues that factual findings must be left for the jury to resolve, and the jury was never asked to find whether Petitioner intentionally killed Officer Caprio.

The State responds that, in enacting Crim. Law § 2-209, the General Assembly did not intend to preempt, either through conflict preemption or field preemption, felony murder when committed by a motor vehicle. It asserts that *Gibson* relies on a "conflict preemption" analysis, and there is not conflict preemption between felony murder and Crim. Law § 2-209(b), as felony murder requires an additional element that Crim. Law § 2-209 does not, namely, the commission of a felony. The State also argues that if Crim. Law § 2-209 was to preempt a field of crimes, it would be the field of gross-negligence

---

[5] Crim. Law § 2-209 is entitled "Manslaughter by Vehicle or Vessel" and defines "vehicle" to include "a motor vehicle, streetcar, locomotive, engine, and train." Crim. Law § 2-209(a). The relevant instrumentality in Petitioner's case is a motor vehicle, so we choose to refer to the statute as the manslaughter by motor vehicle statute.

11

manslaughter by motor vehicle. Regardless, the State argues that felony murder cannot be an unintended homicide, because it is a legal construct that allows the defendant's intent to commit the felony to transfer to and stand in place of the intent to kill required for first-degree murder. The State also asserts that the Court of Special Appeals correctly concluded the fact that evidence existed to support the conclusion that Petitioner intentionally killed Officer Caprio is sufficient for this Court to find that Crim. Law § 2-209 does not preempt Petitioner's felony murder conviction.

## C. Overview of Statutory Preemption of the Common Law

It is helpful to begin with a brief overview of our law on preemption. The General Assembly may abrogate or preempt the common law through statutory enactments, within constitutional bounds. *See WSC/2005 LLC v. Trio Ventures Assocs*., 460 Md. 244, 257–58, 190 A.3d 255, 263 (2018). This abrogation may happen expressly, wherein the General Assembly expressly states a statute is intended to replace the common law, or it may happen by implication through an "adoption of a statutory scheme that is so clearly contrary to the common law right that the two cannot occupy the same space." *Id.* at 258, 190 A.3d at 263.

We have recognized two ways in which the common law may be preempted by implication: field preemption and conflict preemption. "Field preemption is implicated when an entire body of law is occupied on a comprehensive basis by a statute." *Genies v. State*, 426 Md. 148, 155, 43 A.3d 1007, 1010–11 (2012); *see, e.g.*, *Robinson v. State*, 353 Md. 683, 694, 728 A.2d 698, 703 (1999) (holding that certain criminal statutes intended to

12

occupy "the entire subject matter of the law of assault and battery in Maryland, and as such, abrogate the common law on the subject"). On the other hand, "[c]onflict preemption is implicated when a statute repeals the common law 'to the extent of inconsistency.'" *Genies*, 426 Md. at 155, 43 A.3d at 1011 (quoting *Lutz v. State*, 167 Md. 12, 15, 172 A. 354, 356 (1934)). "Conflict preemption occurs when the new legislation has a clear incompatibility and disharmony with the common law, such that both the common law and the statutes cannot coexist." *WSC/2005 LLC*, 460 Md. at 259, 190 A.3d at 263.

In general, implied preemption of the common law is "highly disfavored[.]" *Id.* at 258, 190 A.3d at 263. We have recognized a "generally accepted rule of law that statutes are not presumed to repeal the common law 'further than is expressly declared, and that a statute, made in the affirmative without any negative expressed or implied, does not take away the common law.'" *Robinson*, 353 Md. at 693, 728 A.2d at 702 (quoting *Lutz*, 167 Md. at 15, 172 A. at 356). We explained in *North v. State*, that this rule is grounded in Article 5 of the Maryland Declaration of Rights, which guarantees the inhabitants of the State of Maryland are entitled to the common law of England. 356 Md. 308, 312, 739 A.2d 33, 35 (1999) (citing MD. CONST. DECL. OF RTS. art. 5). We stressed that "[a]lthough that common law may be altered or repealed through statutes duly enacted by the General Assembly, given the Constitutional underpinning, its erosion is not lightly to be implied." *Id.*, 739 A.2d at 35.

### D. Common Law Felony Murder and Crim. Law § 2-209

The common law doctrine of felony murder arose in England in the late 16th and early 17th centuries and has been a part of Maryland common law since the State's founding. *See State v. Allen*, 387 Md. 389, 402, 875 A.2d 724, 732 (2005) (quoting CHARLES E. MOYLAN, JR., CRIMINAL HOMICIDE LAW § 5.1 at 105 (2002)). Although "the common law of felony murder has changed since colonial times . . . in Maryland, it has done so as a matter of common law evolution and not as a result of [legislation]." *Fisher v. State*, 367 Md. 218, 249, 786 A.2d 706, 724 (2001). We have explained that "[a] murder is a malicious killing; it is the mental state of malice that transforms a homicide into the crime of murder." *Allen*, 387 Md. at 402, 875 A.2d at 732. Under the felony murder doctrine, "a person's conduct bringing about an unintended death in the commission or attempted commission of a felony [is] guilty of murder." *State v. Jones*, 451 Md. 680, 696, 155 A.3d 492, 501 (2017).

> We have explained the application of the felony murder doctrine as follows:
>
> [T]he felony-murder rule relies on the imputation of malice from the underlying predicate felony. . . . [W]e [have] limited the felony-murder rule to situations where the intent to commit the underlying felony existed prior to or concurrent with the act causing the death of the victim, and not afterwards. In so doing, we explained: the felony-murder rule is a legal fiction in which the intent and the malice to commit the underlying felony is 'transferred' to elevate an unintentional killing to first degree murder. . . .

*Christian v. State*, 405 Md. 306, 331–32, 951 A.2d 832, 847 (2008) (internal citations and quotations omitted). In other words, "the malice involved in the underlying felony is permitted to stand in the place of the malice that would otherwise be required with respect

to the killing." *Allen*, 387 Md. at 402, 875 A.2d at 732. In this way, even an accidental killing of a person during the commission of a felony is elevated to the level of murder. "To obtain a conviction for felony-murder in Maryland, the State must prove the underlying felony and that the death occurred during the perpetration or in furtherance of the felony." *Jones*, 451 Md. at 696–97, 155 A.3d at 501.

We now turn to the manslaughter by motor vehicle statute, which Petitioner alleges preempts felony murder when the killing in question is unintentional and committed with a motor vehicle. Crim. Law § 2-209 provides, in relevant part:

**Prohibition**

(b) A person may not cause the death of another as a result of the person's driving, operating, or controlling a vehicle or vessel in a grossly negligent manner.

**Name of crime**

(c) A violation of this section is manslaughter by vehicle or vessel.

**Penalty**

(d)(1) Except as provided in paragraph (2) of this subsection, a person who violates this section is guilty of a felony and on conviction is subject to imprisonment not exceeding 10 years or a fine not exceeding $5,000 or both.[6]

Petitioner does not argue that there is any express pronouncement in the legislative history or statutory text of Crim. Law § 2-209 reflecting that the statute is intended to

---

[6] Enhanced penalties are imposed on those who have previously been convicted of certain provisions of the Transportation Article of the Maryland Code. *See* Crim. Law § 2-209(d)(2).

15

preempt common law felony murder, where the killing during the commission of a felony is committed unintentionally and with a motor vehicle. Instead, Petitioner argues that "the entire subject matter of common law unintended homicide resulting from the operation of a motor vehicle has been preempted by statute[,]" including in cases of felony murder. In support of his position, Petitioner relies on two cases from the Court of Special Appeals: *Gibson*, 4 Md. App. 236, 242 A.2d 575 and *Blackwell*, 34 Md. App. 547, 369 A.2d 153.

In *Gibson*, a defendant killed a woman while allegedly driving under the influence of alcohol. 4 Md. App. at 238–39, 242 A.2d at 576–77. Four of the five charges levied against the defendant were not based on gross negligence involuntary manslaughter, but instead on a theory of common law misdemeanor-manslaughter, due to various alleged violations of motor vehicle laws.[7] *Id.* at 239, 242 A.2d at 577. The defendant moved to dismiss those charges, alleging that they were preempted by the manslaughter by vehicle statute, then codified as Section 388 of Article 27 of the Maryland Code (1967 Repl. Vol.).[8]

---

[7] The fifth charge, however, was expressly based on the manslaughter by vehicle statute and alleged that defendant "while operating a motor vehicle 'unlawfully in a grossly negligent manner' caused the death of the decedent." *Gibson*, 4 Md. App. at 239, 242 A.2d at 577.

[8] At the time of *Gibson*, the manslaughter by motor vehicle statute stated as follows:

Every person causing the death of another as the result of the driving, operation or control of an automobile, motor vehicle, motorboat, locomotive, engine, car, streetcar, train or other vehicle in a grossly negligent manner, shall be guilty of a misdemeanor to be known as 'manslaughter by automobile, motor vehicle, motorboat, locomotive, engine, car, streetcar, train or other vehicle,' and the person so convicted shall be sentenced to jail or the house of correction for not more than three years, or be fined not more

(continued …)

16

*Id.* at 240, 242 A.2d at 577.  The State countered that the manslaughter by motor vehicle statute only applied to charges of manslaughter involving gross negligence and did not preempt common law misdemeanor manslaughter charges arising from the operation of a motor vehicle.  *Id.* at 241, 242 A.2d at 578.

The Court of Special Appeals ultimately agreed with the defendant that the manslaughter by motor vehicle statute preempted common law misdemeanor manslaughter charges arising from the operation of a motor vehicle.  *Id.* at 246–47, 242 A.2d at 581–82.  The court explained that, at the time the manslaughter by motor vehicle statute was passed in 1941, "there was an overlapping and blurring between and among the different theories of criminal responsibility," arising from violations of the motor vehicle law "since in most instances such a violation constituted not only an unlawful act, but one dangerous to the lives and safety of others and such as manifested a wanton and reckless disregard of human life."  *Id.* at 245–46, 242 A.2d at 581.  The Court of Special Appeals concluded that,

> in enacting Section 388, the [General Assembly] intended to deal with an entire subject matter—unintended homicides resulting from the operation of a motor vehicle—and that the common law crime of involuntary manslaughter, when based on homicides so occurring, is in conflict with the statute and must yield to it to the extent of the inconsistency.

---

(… continued)
than $1,000.00 or be both fined and imprisoned. . . .

*Gibson*, 4 Md. App. at 239–40, 242 A.2d at 577 (quoting Md. Code, Art. 27 § 388 (1967 Repl. Vol.)).  For our purposes, the substance of the statute is not meaningfully different from its present form in Crim. Law § 2-209, although the penalty has been enhanced to a maximum of ten years' imprisonment, or a fine not exceeding $5,000, or both, with greater penalties available for persons previously convicted under certain sections of the Transportation Article.  *See* Crim. Law § 2-209(d).

*Id.* at 247, 242 A.2d at 581. The intermediate court reasoned, in part, that to determine otherwise would permit prosecutors to choose between charging offenders of such crimes with felony common law manslaughter, which had a ten-year penalty at the time and required a lesser degree of proof, and charging under the manslaughter by vehicle statute, which had only a three-year penalty at the time and required a greater degree of proof. *Id.* at 246, 242 A.2d at 581. The Court of Special Appeals determined that such an incongruous result could not have been the intent of the General Assembly when enacting the manslaughter by motor vehicle statute. *Id.* at 246–47, 242 A.2d at 581–82. In *State v. Gibson*, 254 Md. 399, 401, 254 A.2d 691, 692 (1969), we expressly approved this holding and reasoning of the Court of Special Appeals.

The question of which crimes are preempted by the manslaughter by motor vehicle statute was revisited by the Court of Special Appeals in *Blackwell*, 34 Md. App. 547, 369 A.2d 153. That case involved an appellant who was convicted of second-degree depraved heart murder, after he hit and killed a bicyclist with his vehicle while driving when drunk and fled the scene. *Id.* at 549, 369 A.2d at 155–56. The Court of Special Appeals concluded the circuit court erred in instructing the jury on the element of malice, and there was insufficient evidence presented to fulfill the "malice" requirement for second-degree murder, as habitually driving while intoxicated[9] does not promote an inference of "viciousness or extreme indifference to the value of human life[,]" necessary for second-

---

[9] Evidence was introduced at trial that the appellant had a prior conviction of driving while impaired, had been involved in an accident while intoxicated 2 to 3 years earlier, and had a "propensity to overinduldge[.]" *Blackwell*, 34 Md. App. at 550, 369 A.2d at 156.

18

degree depraved heart murder. *Id.* at 554, 369 A.2d at 158 (internal quotations omitted). The court also held that an accident caused by a habitually drunk driver lacked the *mens rea* requirement of "willfulness" necessary for second-degree depraved heart murder. *Id.*, 369 A.2d at 158.

The Court of Special Appeals also observed that in passing the manslaughter by motor vehicle statute, "the [General Assembly] intended to preempt the subject matter of unintended homicides resulting from the operation of a motor vehicle." *Id.* at 554–55, 369 A.2d at 158–59 (citing Md. Code, Art. 27, § 388 and *Gibson*, 4 Md. App. at 246, 242 A.2d at 581). The Court of Special Appeals determined that "[i]n the absence of evidence of intentional homicide, we hold that the statutory preemption applies as well to second degree murder as it did in [*Gibson*] to manslaughter." *Id.* at 555, 369 A.2d at 159.

At this juncture, it is important to clarify the holding in *Blackwell*. The Court of Special Appeals in that case concluded the evidence was insufficient to convict the defendant of second-degree depraved heart murder, and therefore its determination that a second-degree murder conviction was preempted by the manslaughter by vehicle statute was only *dicta*. Additionally, the Court of Special Appeals in *Blackwell* mischaracterized the *mens rea* necessary for second-degree depraved heart murder. In particular, the court determined that the evidence was not sufficient to support a jury verdict for second-degree depraved heart murder, in part, because the defendant lacked the "willfulness" which it stated was necessary for depraved heart murder and "connotes a *deliberate intent* to bring

19

about the result which actually comes to pass[.]"[10]  *Id.* at 554, 369 A.2d at 158 (emphasis added).  The Court of Special Appeals stated that:

> Unless we assume that appellant's drinking habits fulfill that interpretation of willfulness, rather than viewing his propensity to imbibe as a personal gratification-however selfish and objectionable-the record contains no evidence of 'willfulness'.  There is no evidence to indicate the drinking was motivated by a purposeful or deliberate intent to bring about the tragic result.

*Id.* at 554, 369 A.2d at 158.

As we recently explained in *Beckwitt v. State*, the *mens rea* necessary for second-degree depraved heart murder is "the willful doing of a dangerous and reckless *act* with wanton indifference to the consequences and perils involved[.]"  477 Md. 398, 467, 270 A.3d 307, 348, (2022), *reconsideration denied* (Mar. 25, 2022) (emphasis added) (quoting *Robinson v. State*, 307 Md. 738, 744, 517 A.2d 94, 97 (1986)).  We explained further that,

> [d]epraved heart murder may be perpetrated without the slightest trace of personal ill-will and, instead, the willful doing of a dangerous and reckless act with wanton indifference to the consequences and perils involved, is just as blameworthy, and just as worthy of punishment, when the harmful result ensues, as is the express intent to kill itself.

---

[10] The Court of Special Appeals also cited from Black's Law Dictionary for its definitions of willfulness, as follows:

> Proceeding from a conscious motion of the will; voluntary.

> Intractable; having a headstrong disposition to act by the rule of contradiction.

> Intending the result which actually comes to pass; designed; intentional; not accidental or involuntary.

*Blackwell*, 34 Md. App. at 554, 369 A.2d at 158 (quoting BLACK'S LAW DICTIONARY 1773 (rev. 4th ed. 1968) (citations omitted))

*Id.* at 468, 270 A.3d at 348 (quoting *In re Eric F.,* 116 Md. App. 509, 520, 698 A.2d 1121, 1126 (1997)) (internal quotations omitted).  Thus, contrary to the characterization of the Court of Special Appeals in *Blackwell*, the "willfulness" necessary for second-degree depraved heart murder pertains to willfully committing an *act* that demonstrates a reckless disregard for the value of human life, not for willfully bringing about the *result* of another person's death.  As such, second-degree depraved heart murder, when perpetrated with a motor vehicle, still falls under the category of an unintended homicide and is preempted by Crim. Law § 2-209.

We do not agree with Petitioner that the reasoning in *Blackwell* extends Crim. Law § 2-209 to preempt felony murder perpetrated with a motor vehicle.  Unlike involuntary manslaughter or second-degree depraved heart murder, felony murder is not an unintended crime.  As discussed above, felony murder is an artificial legal concept whereby the intent to commit the underlying felony is transferred to the intent necessary for first-degree murder.  *See Christian*, 405 Md. at 332, 951 A.2d at 847 ("[T]he felony-murder rule is a legal fiction in which the intent and the malice to commit the underlying felony is 'transferred' to elevate an unintentional killing to first degree murder. . . ."); *Allen*, 387 Md. at 402, 875 A.2d at 732 ("[T]he malice involved in the underlying felony is permitted to stand in the place of the malice that would otherwise be required with respect to the killing.").  We have explained that "[i]t is not the case that these mental states imply malice;

21

it is rather the case that they *are malice by definition*[,]"[11] and thus the "defendant is acting maliciously at the time he kills, even if the object of his malice is unrelated to the victim's death." *Allen*, 387 Md at 403, 875 A.2d at 732 (emphasis added). When a killing occurs during the course of a felony, we treat the individual who intended to commit the felony, as if he intended to kill the victim. In this way, felony murder is not an unintended homicide. Since felony murder is not an unintended homicide, it cannot be preempted by Crim. Law § 2-209. *See Gibson*, 4 Md. App. at 247, 242 A.2d at 581 (holding that the manslaughter by vehicle statute is intended to preempt the "entire subject matter [of] unintended homicides resulting from the operation of a motor vehicle").

---

[11] We also note that the Court of Special Appeals in *Blackwell* mischaracterized felony murder as an "implied malice" homicide. 34 Md. App. at 553, 369 A.2d at 157. In *Allen*, we explained:

> The common law felony-murder doctrine solidified in the late 1500's and very early 1600's as the expression of one of the forms of implied malice. To constitute murder at that time, it was necessary that a homicide be committed with 'malice,' to wit, with an intent to kill. In its earlier manifestation, the notion was that the intentional perpetration or attempted perpetration of a life-endangering felony implied the intent to kill so as to make any homicide resulting from the felony or attempted felony an instance of murder. Our current analysis, of course, is that the intended perpetration of the felony is an independent murderous mens rea, should death result, and is just as blameworthy and just as worthy of punishment as murder as would be the specific intent to kill. *'It is not the case that these mental states imply malice; it is rather the case that they are malice by definition.'* The transformation from an evidentiary phenomenon to a substantive phenomenon did not alter the end result.

387 Md. at 402–03, 875 A.2d at 732 (emphasis added) (quoting CHARLES E. MOYLAN, JR., CRIMINAL HOMICIDE LAW § 5.1 at 105 (2002) in turn quoting *Evans v. State*, 28 Md. App. 640, 700, 349 A.2d 300 (1975), *aff'd*, 278 Md. 197, 362 A.2d 629 (1976)).

22

This determination is aligned with the particular policy judgments that lie behind the felony murder rule. The felony murder rule is intended to "deter dangerous conduct by punishing as murder a homicide resulting from dangerous conduct in the perpetration of a felony, even if the defendant did not intend to kill[]" and is reflective of "society's judgment, [that] a felony committed intentionally that causes the death of another person is qualitatively more serious than an identical felony that does not." *Jones*, 451 Md. at 696, 155 A.3d at 501 (internal citations and quotations omitted). Treating a killing that occurs during the course of a felony in the same way as first-degree murder is rooted in the judgment that the intent to perpetrate a felony that results in a death, is as worthy of blame and punishment as a specific intent to kill. *See Allen*, 387 Md. at 403, 875 A.2d at 732 (quoting CHARLES E. MOYLAN, JR., CRIMINAL HOMICIDE LAW § 5.1 at 105 (2002)).

Permitting Crim. Law § 2-209 to preempt certain killings that occur during the course of a felony would directly conflict with the felony murder rule's rationale of punishing *all* killings that occur during the course of the felony as if they were murder because of this Court's recognition of the seriousness of such offenses. *See Campbell v. State,* 293 Md. 438, 451–52, 444 A.2d 1034, 1042 (1982) ("[U]nder the felony-murder doctrine, criminal culpability shall continue to be imposed for all lethal acts committed by a felon or an accomplice acting in furtherance of a common design."). Petitioner has failed to offer any compelling rationale for why a killing perpetrated with a motor vehicle in furtherance of a felony should be treated differently than all other felony murders, simply because it was perpetrated with a motor vehicle.

23

Neither has Petitioner offered a compelling reason to believe that it was the General Assembly's intent when adopting the manslaughter by motor vehicle statute to preempt a crime as serious as felony murder, with a criminal statute that provides comparatively minor penalties. *See Genies*, 426 Md. at 153–54, 43 A.3d at 1010 ("[I]t is not to be presumed that the [General Assembly] intended to make any innovation upon the common law, further than the case absolutely required, but that [t]he law rather infers that the act did not intend to make any alteration other than what is specified, and besides what has been plainly pronounced.") (citations, internal quotations, and emphasis omitted). Rather, as discussed in *Gibson*, the General Assembly's intent in passing the manslaughter by motor vehicle statute was to homogenize the "overlapping and blurring between and among the different theories of criminal responsibility[]" when "unintentional homicides proximately resulted from driving an automobile in violation of laws designed to regulate and control the operation of motor vehicles in the interest of public safety[.]" 4 Md. App. at 246, 242 A.2d at 581. This legislative purpose does not extend within the context of felony murder, which constitutes a clear and longstanding doctrine to treat any killing that occurs in furtherance of a felony, no matter the circumstance, as an intentional murder.

## E. The Present Case

As stated above, "[t]o obtain a conviction for felony-murder in Maryland, the State must prove the underlying felony and that the death occurred during the perpetration or in furtherance of the felony." *Jones*, 451 Md. at 696–97, 155 A.3d at 501. Petitioner does not contest his conviction for felony burglary, nor does he dispute the killing of Officer

24

Caprio occurred during his attempted escape from the felonious burglary. Under the felony murder doctrine, the intent that Petitioner had to commit felony burglary, was transferred to the intent necessary to find him guilty of the felony murder of Officer Caprio. This is true regardless of whether Petitioner actually intended to kill Officer Caprio when he ran her over with the stolen Jeep.

We do see merit in Petitioner's objection to the Court of Special Appeals' statement that evidence and arguments presented at trial are supportive of a finding that Petitioner did intend to kill Officer Caprio, provided another ground for determining that Petitioner's felony murder conviction was not preempted by Crim. Law § 2-209. After determining that Petitioner's felony murder conviction could not be categorized as an unintentional homicide and thus was not preempted by Crim. Law § 2-209, the Court of Special Appeals went on to say,

> although [Petitioner] argues that the killing here was unintentional, the jury in this case was not asked to, and it did not specify, whether it found an unintentional homicide. The State argued, and the facts would have permitted a finding, that [Petitioner] intended to run over Officer Caprio when he hit the gas while she was standing in front of the car. Accordingly, we reject [Petitioner's] argument that his felony murder conviction should be vacated because the manslaughter by vehicle statute ([Crim. Law] § 2-209) preempted his felony murder conviction.

*Harris*, 251 Md. App. at 640, 256 A.3d at 308–09.

Petitioner is correct to argue that, where the jury was not asked to find whether Petitioner intentionally killed Officer Caprio, the Court of Special Appeals should not have relied on a hypothetical finding of intentionality to support a conclusion that Crim. Law §2-209 did not preempt Petitioner's felony murder conviction. The jury, not the appellate

25

court, is the factfinder; where the jury is not asked to decide an issue of fact, the Court of Special Appeals cannot rely on a factual finding that it *could* have made as a basis for determining a question of law. *See* MD. CONST. DECL. OF RTS. art. 23 ("In the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of fact, except that the Court may pass upon the sufficiency of the evidence to sustain a conviction."); *Tracy v. State*, 423 Md. 1, 11, 31 A.3d 160, 165 (2011) ("We need not decide whether the jury could have drawn other inferences from the evidence, refused to draw inferences, or whether we would have drawn different inferences from the evidence."); *State v. Mayers*, 417 Md. 449, 466, 10 A.3d 782, 792 (2010) ("[I]t is not the function or duty of the appellate court to undertake a review of the record that would amount to, in essence, a retrial of the case.") (quoting *State v. Albrecht*, 336 Md. 475, 478, 649 A.2d 336, 337 (1994)); *Smith v. State,* 415 Md. 174, 185, 999 A.2d 986, 992 (2010) ("Because the fact-finder possesses the unique opportunity to view the evidence and to observe first-hand the demeanor and to assess the credibility of witnesses during their live testimony, we do not re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence.").

This error by the Court of Special Appeals is inconsequential. As discussed above, we agree with the holding of the Court of Special Appeals that Crim. Law § 2-209 cannot preempt a felony murder conviction because felony murder is not an unintended homicide. *See Harris*, 251 Md. App. at 639–40, 256 A.3d at 308. This suffices for upholding Petitioner's felony murder conviction, and the Court of Special Appeals' discussion of factual inferences that could have been drawn from the evidence was not necessary for its

26

determination that there was no preemption under Crim. Law § 2-209. As such, the statement can either be categorized as an alternative holding or *dicta* and, although erroneous, does not necessitate a reversal of the holding of the Court of Special Appeals. *Cf. Margolis v. Sandy Spring Bank,* 221 Md. App. 703, 715, 110 A.3d 784, 791 (2015) ("[B]ecause the circuit court's reliance on [a particular section of a statute] was in the nature of an alternative holding, the error does not require reversal[.]").

## II. The Constitutionality of Petitioner's Sentence

### A. Standard of Review

Under Maryland Rule 4-345(a), this Court "may correct an illegal sentence at any time." A motion to correct an illegal sentence will be granted where there is some illegality in the sentence itself or where no sentence should have been imposed. *See State v. Wilkins*, 393 Md. 269, 274, 900 A.2d 765, 768 (2006). "Whether a sentence is an illegal sentence under Maryland Rule 4-345(a) is a question of law that is subject to [*de novo*] review." *State v. Crawley*, 455 Md. 52, 66, 166 A.3d 132, 140 (2017). A sentence that constitutes cruel and unusual punishment under the Eighth Amendment or Article 25 is an illegal sentence under Maryland Rule 4-345(a). *See Randall Book Corp. v. State*, 316 Md. 315, 322, 558 A.2d 715, 719 (1989).

### B. Contentions of the Parties

Petitioner argues that the sentence of life in prison with the possibility of parole for the felony murder of Officer Caprio was unconstitutional under the Eighth Amendment. Relying primarily on the Supreme Court's opinion in *Miller v. Alabama*, 567 U.S. 460, 132

S. Ct. 2455 (2012), Petitioner argues that he was entitled to a constitutionally heightened individualized sentencing proceeding where his youth and attendant circumstances were considered before such a sentence was imposed. He asserts the distinctive attributes of youth are especially relevant for a conviction of felony murder, but that Maryland's statutory scheme, which automatically imposes a life sentence for a felony murder conviction, does not provide for such a consideration. Petitioner also asserts Article 25 of the Maryland Declaration of Rights affords even greater protection than the Eighth Amendment for juvenile offenders. Petitioner argues that the sentencing court did not meet the constitutional standards for an individualized sentencing proceeding under either the Eighth Amendment or Article 25. Petitioner further argues that, as applied, his sentences were grossly disproportionate, and thus unconstitutional.

The State replies that *Miller*'s individualized sentencing requirements only apply to juveniles sentenced to life in prison *without* the possibility of parole, and thus are not applicable to Petitioner's sentence of life in prison *with* the possibility of parole. The State also asserts that Article 25 provides Petitioner no greater protection than the Eighth Amendment, but instead is interpreted *in pari materia* with the Eighth Amendment. Furthermore, the State asserts that even if *Miller* was applicable, Petitioner did receive an individualized sentencing proceeding where his youth and attendant circumstances were considered. Finally, the State rejects Petitioner's argument, that, as applied, Petitioner's sentences were grossly disproportionate in violation of the Eighth Amendment or Article 25.

28

## C. Petitioner's Sentence Did Not Violate the Eighth Amendment

The Eighth Amendment of the United States Constitution prohibits, among other things, the imposition of "cruel and unusual punishments[.]" U.S. CONST. amend. VIII. In a string of cases, beginning with *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011 (2010), *as modified* (July 6, 2010) and culminating most recently with *Jones v. Mississippi*, ___ U.S. ___, 141 S. Ct. 1307 (2021), the Supreme Court has addressed in what circumstances it is constitutional under the Eighth Amendment to sentence juvenile offenders to life in prison without the possibility of parole. In *Graham*, the Court held that the Eighth Amendment categorically prohibits a sentence of life in prison without the possibility of parole for non-homicide crimes. 560 U.S. at 82, 130 S. Ct. at 2034. The Court specified that while "[a] State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime[,]" it must give such offenders "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at 75, 130 S. Ct. at 2030.

Two years later in *Miller*, the Court held that the Eighth Amendment prohibits *mandatory* sentences of life without the possibility for parole, even for juvenile homicide offenders. 567 U.S. at 465, 132 S. Ct. at 2460. The Court held that a mandatory sentencing scheme posed "too great a risk of disproportionate punishment[]" and that instead, sentencers are required "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 479–80, 132 S. Ct. at 2469 (footnote omitted). The Court explained that its decision did not

prohibit the imposition of life in prison without the possibility of parole for such offenders, but mandated that "an offender's youth and attendant characteristics" be considered before imposing a penalty of life in prison without the possibility of parole. *Id.* at 483, 132 S. Ct. at 2471. In *Montgomery v. Louisiana*, the Supreme Court held that *Miller* announced a substantive rule that applied retroactively. 577 U.S. 190, 212, 136 S. Ct. 718, 736 (2016), *as revised* (Jan. 27, 2016).

Most recently in *Jones*, the Supreme Court clarified its holdings in *Miller* and *Montgomery* and held that those cases did not require a sentencer to make a finding of permanent incorrigibility before sentencing a juvenile homicide offender to life in prison without the possibility of parole. *Jones*, ___ at __, 141 S. Ct. at 1319. The Court observed that "[i]n a case involving an individual who was under 18 when he or she committed a homicide, a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient." *Id.* at __, 141 S. Ct. at 1313 (footnote omitted). Furthermore, it explained that an "on-the-record sentencing explanation is not necessary to ensure that a sentencer considers a defendant's youth[]" in order to meet the procedural requirements of *Miller* because "if the sentencer has discretion to consider the defendant's youth, the sentencer necessarily will consider the defendant's youth, especially if defense counsel advances an argument based on the defendant's youth." *Id.* at __, 141 S. Ct. at 1319 (emphasis omitted).

Critically, all the cases discussed above, which are relied upon by Petitioner, concern juveniles sentenced to life in prison *without* the possibility of parole. They do not

apply to the sentence imposed on Petitioner, which was life in prison *with* the possibility of parole. The point that the line of cases, from *Graham* to *Jones*, is inapplicable to sentences of life in prison *with* the possibility of parole, is emphasized by the Supreme Court's holding in *Montgomery* that

> [g]iving *Miller* retroactive effect . . . does not require States to relitigate sentences, let alone convictions, in every case where a juvenile offender received mandatory life without parole. A State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them.

577 U.S. at 212, 136 S. Ct. at 736. *Montgomery* held that a *Miller* violation can be remedied simply by making an offender eligible for parole, thus sentences that are already parole-eligible cannot also violate *Miller*.

This determination was pointed out in *Hartless v. State*, 241 Md. App. 77, 209 A.3d 147 (2019). In that case, the Court of Special Appeals dealt with a claim nearly identical to the one Petitioner brings before us today, namely, a juvenile homicide offender argued that his sentence of life in prison with the possibility parole failed to comply with *Miller*'s sentencing requirements, as he alleged that he failed to receive an individualized sentencing proceeding at which his "youth and attendant circumstances[]" were considered. *Id.* at 85, 209 A.3d at 152. The Court of Special Appeals correctly explained that "[t]he right identified in *Miller* and *Montgomery* pertains specifically to juvenile offenders sentenced to life imprisonment *without parole*, not to all juvenile homicide offenders." *Id.* at 89–90, 209 A.3d at 155. The court observed that,

> if a *Miller* violation can be remedied simply by permitting a juvenile offender to be considered for parole, it is illogical to suggest that *Montgomery* and

31

> *Miller* somehow require an individualized sentencing process for all juveniles convicted of homicide, regardless of whether they are sentenced to life with or without parole.

*Id.* at 87, 209 A.3d at 153.

Although *Miller* does not apply to the sentence imposed in the case at bar, Petitioner received an adequately individualized sentencing proceeding as contemplated by *Miller*. The Supreme Court in *Jones* explained that all *Miller* requires is an individualized sentencing proceeding where the sentencing judge has discretion to give the juvenile offender a sentence that is less than life in prison without the possibility of parole. ___ U.S. at ___, 141 S. Ct. at 1311 ("Under [*Miller*], an individual who commits a homicide when he or she is under 18 may be sentenced to life without parole, but only if the sentence is not mandatory and the sentencer therefore has discretion to impose a lesser punishment."); *id.* at ___, 141 S. Ct. at 1313 ("In a case involving an individual who was under 18 when he or she committed a homicide, a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient.") (footnote omitted).

Although Petitioner received a sentence of life in prison under Crim. Law § 2-201 for his felony murder conviction, the sentencing judge had discretion under that statutory scheme to impose a sentence of less than life in prison without the possibility of parole. Crim. Law § 2-201(b)(1) ("A person who commits a murder in the first degree is guilty of a felony and on conviction shall be sentenced to: (i) imprisonment for life without the possibility of parole; or (ii) imprisonment for life."). Petitioner actually received a sentence

32

that was less than life in prison without the possibility of parole, which was consistent with what is required by *Miller* and *Jones*.

The record demonstrates that the sentencing court *did* individually consider Petitioner's youth and attendant circumstances prior to issuing its sentencing decision. Among other things, the sentencing court was provided with a twenty-five-page pre-sentence investigation report, which included Petitioner's age and a comprehensive review of his criminal history, personal history, current family situation, educational history, and mental health issues. Likewise, at the sentencing hearing, defense counsel advanced several mitigating arguments based on Petitioner's youth and its attendant circumstances, including, among other things:

> I don't know, again, what's going on in the mind of a 16-year-old in the way they see things, but to determine that he's beyond redemption is absolutely absurd and ridiculous. You know, the bulk of his existence, even though in some very challenging circumstances he was law-abiding. It wasn't until the last six months of his being 15 leading into 16 that you saw these difficulties. Again, it didn't deal with any violence, it was truancy, it was getting high, it was stealing cars.
>
> Not robbing anybody of their car, but stealing cars and the like, and selling some weed that the State made mention of. This was growing up in circumstances that as he mentioned in his pre[-]sentence investigation report – it's mentioned where it's just the norm, a deteriorating, deleterious, ugly existence from the garbage in the streets to the graffiti on the walls, from the rats running through, from the lead paint on the walls, but yet -- and the father not there.
>
> You know, it sounds like something out of *Les Misérables*, but his father is in prison –was in prison at the time. He's down in Gilmor homes growing up with his mom being the one that's helping him.

A letter written by Petitioner was also read at the sentencing hearing, which stated, among other things:

> I'd just wanna remind everyone we're still kids, and we do things without thinking about the outcome and the consequences.

> On the day of May 21, 2018, nobody thought about what could happen, only what we wanted to happen. Our minds were not fully developed because we were 15, 16 years of age at the time and they're still not developed yet. My point is, we're still young and that nobody is perfect. We all make mistakes, and I admit I made mistakes, but I really believe that I should be given a second chance.

As expressed by the Supreme Court in *Jones*, when "[f]aced with a convicted murderer who was under 18 at the time of the offense and with defense arguments focused on the defendant's youth, it would be all but impossible for a sentencer to avoid considering that mitigating factor." ___ U.S. at ___, 141 S. Ct. at 1319. Based on the sentencing judge's knowledge of Petitioner's age and the mitigating evidence presented during the sentencing hearing, it was not necessary for the sentencing court to make an express on-the-record statement that it considered Petitioner's youth and attendant circumstances. *See id.* at ___, 141 S. Ct. at 1319 (footnote omitted). The sentencing court did just that. It stated that, "[h]aving considered the pre[-]sentence investigation, the victim impact, the Defendant's prior record, the arguments of counsel, [and] the allocution, the appropriate sentence that I'm going to impose *having all factors having been considered . . .*" is life in prison with the possibility of parole for Petitioner's felony murder conviction.

In sum, *Miller*'s requirement that a juvenile offender's youth and attendant circumstances be considered by the sentencing court does not apply to Petitioner's sentence

34

of life in prison *with* the possibility of parole.  Even if it did apply, the sentencing hearing was constitutionally sufficient, as Petitioner received an individualized sentencing proceeding where the sentencing court had discretion to sentence him to less than life in prison without the possibility of parole.  Furthermore, even though the sentencing court was not required to expressly consider Petitioner's youth and attendant circumstances, it did so.

### D.  Petitioner's Sentence Did Not Violate Article 25

We hold that Article 25 of the Maryland Declaration of Rights does not afford any greater protection for Petitioner.  Article 25 states: "[t]hat excessive bail ought not to be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted, by the Courts of Law."  MD. CONST. DECL. OF RTS. art. 25.  Petitioner argues that because Article 25 uses a disjunctive "or" between the terms "cruel" and "usual," it provides greater protection than its Eighth Amendment parallel, which uses the term "and" between the terms "cruel" and "unusual."

Although in *Carter v. State*, we noted that "there is some textual support for finding greater protection in the Maryland [constitutional] provisions," we also noted in the same sentence that we have usually construed Article 25 to "provide the same protection as the Eighth Amendment."  461 Md. 295, 308 n.6., 192 A.3d 695, 702 n.6. (2018) (citing *Thomas v. State*, 333 Md. 84, 103 n.5, 634 A.2d 1, 10 n.5 (1993)).  In *Thomas*, we explained that:

> Our cases interpreting Article 25 of the Maryland Declaration of Rights have generally used the terms "cruel and unusual" and "cruel or unusual" interchangeably.  The Court of Special Appeals has suggested that "the adjective 'unusual' adds nothing of constitutional significance to the

35

adjective 'cruel' which says it all, standing alone." Because the prevailing view of the Supreme Court recognizes the existence of a proportionality component in the Eighth Amendment, we perceive no difference between the protection afforded by that amendment and by the 25th Article of our Declaration of Rights.

333 Md. at 103 n.5, 634 A.2d at 10 n.5 (internal citations omitted) (quoting *Walker v. State*, 53 Md. App. 171, 193 n.9, 452 A.2d 1234, 1245 n.9 (1982)). Indeed, the fact that in *Carter*, we interpreted Article 25 to provide the same protections as the Eighth Amendment in the context of juvenile offenders sentenced to life imprisonment, contradicts Petitioner's assertion that Article 25 affords greater protection than the Eighth Amendment in this circumstance. 461 Md. at 308 n.6, 192 A.3d at 702 n.6.

Petitioner urges us to employ Article 25 to include additional procedural safeguards for juveniles convicted of murder, pursuant to the "invitation" that Petitioner alleges was given by the Supreme Court in *Jones*. *See* ___ U.S. at___, 141 S. Ct. at 1323 ("[O]ur holding today does not preclude the States from imposing additional sentencing limits in cases involving defendants under 18 convicted of murder."). We conclude that the General Assembly has already provided additional protections for juvenile defendants by passing the Juvenile Restoration Act ("JUVRA"), codified in Md. Code, Criminal Procedure ("Crim. Proc.") §§ 6-235; 8-110. *See* 2021 Md. Laws, Ch. 61. Crim. Proc. § 8-110 provides that juvenile offenders who have been sentenced prior to October 1, 2021, like Petitioner, automatically become eligible to have their sentences reduced after serving twenty years in prison. Thus, although not constitutionally mandated to do so, Maryland does provide additional procedural safeguards for juvenile offenders, like Petitioner, facing

36

lengthy sentences. Petitioner has not provided a compelling reason, especially in light of recent legislative actions, for us to stray from our longstanding precedent of interpreting Article 25 *in pari materia* with the Eighth Amendment.

**E. Petitioner's Sentence Was Not Grossly Disproportionate as Applied**

Finally, we do not agree with Petitioner that his sentence was grossly disproportionate as applied. In *Stewart v. State*, relying on Supreme Court precedent, we stated that "[t]he Eighth Amendment encompasses a narrow proportionality principle prohibiting 'grossly disproportionate' sentences[]" but that "successful challenges to the proportionality of a particular sentence are exceedingly rare." 368 Md. 26, 31, 791 A.2d 143, 146 (2002) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 997, 111 S. Ct. 2680, 2702 (1991) (Kennedy, J., concurring) and *Solem v. Helm*, 463 U.S. 277, 103 S. Ct. 3001 (1983)). We explained that "the Eighth Amendment does not require strict proportionality between crime and sentence. Rather it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id.* at 32, 791 A.2d at 147 (quoting *Harmelin*, 501 U.S. at

1001, 111 S. Ct. at 2705 (Kennedy, J., concurring), in turn, quoting *Solem*, 463 U.S. at 288, 103 S. Ct. at 3008).

In *Thomas*, we outlined the standard for evaluating claims of gross disproportionality as follows: [12]

> [A] reviewing court must first determine whether the sentence appears to be grossly disproportionate. In so doing, the court should look to the seriousness of the conduct involved, the seriousness of any relevant past conduct . . . , any articulated purpose supporting the sentence, and the importance of deferring to the [General Assembly] and to the sentencing court.
>
> If these considerations do not lead to a suggestion of gross disproportionality, the review is at an end. If the sentence does appear to be grossly disproportionate, the court should engage in a more detailed *Solem*-type analysis.

333 Md. at 95, 634 A.2d at 6.

It is evident that Petitioner's case does not reflect gross disproportionality warranting a determination that his life sentence was unconstitutional as applied. Petitioner's conduct was extremely serious: he committed a felony during which he caused the loss of a human life. As discussed above, the gravity of such an offense has long been recognized by the felony murder doctrine treating any killing occurring in the course of a felony as murder. The General Assembly recognized the seriousness of such conduct by punishing all offenders convicted of first-degree murder, including first-degree felony

---

[12] Neither *Miller* nor *Jones* created a special or heightened as-applied proportionality test for juvenile offenders. *See Jones*, ___ U.S. at ____, 141 S. Ct. at 1322 ("[T]his case does not properly present—and thus we do not consider—any as-applied Eighth Amendment claim of disproportionality regarding Jones's sentence.").

38

murder, with life in prison, either with or without the possibility of parole. *See* Crim. Law § 2-201(b)(1). As aptly expressed by the Court of Special Appeals: "[g]iven that [Petitioner's] conduct caused another person to lose her life, the life sentence does not appear grossly disproportionate." *Harris*, 251 Md. App. at 659, 256 A.3d at 320. As the serious nature of Petitioner's crimes does not suggest gross disproportionality in Petitioner's sentence, our review "is at an end." *Thomas*, 333 Md. at 95, 634 A.2d at 6.

## CONCLUSION

We hold that Petitioner's felony murder conviction for the killing of Officer Amy Caprio was not preempted by the manslaughter by motor vehicle statute because felony murder is not an unintended homicide, and thus does not fall within the field of crimes preempted by that statute. We also hold that Petitioner's sentence of life in prison with the possibility of parole was not unconstitutional under either the Eighth Amendment of the United States Constitution or Article 25 of the Maryland Declaration of Rights. Petitioner was not entitled to an individualized sentencing proceeding under *Miller* because he received a sentence of life in prison *with* the possibility of parole, and *Miller* and its progeny only apply to juveniles who are sentenced to life in prison *without* the possibility of parole. Even if *Miller* applied, Petitioner received an individualized sentencing proceeding where his youth and attendant circumstances were considered. Article 25 does not afford Petitioner any greater protection than the Eighth Amendment, and Petitioner's sentence was not grossly disproportionate as applied.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**